ALTA INDUSTRIES LTD., a Utah limited partnership, dba Steelco, and Alta Industries—Utah, Inc., a Utah corporation, in its capacity as general partner of Alta Industries Ltd., Plaintiffs, Appellees, and Cross–Appellants,

v.

Lynn P. HURST and Wasatch Steel, Inc., a Utah corporation, Defendants, Appellants, and Cross–Appellees.

No. 900612.

Supreme Court of Utah.

Jan. 20, 1993.

Bruce A. Maak, Salt Lake City, for plaintiffs.

L.R. Gardiner, Suzanne K. Cavanaugh, Salt Lake City, for defendants.

HALL, Chief Justice:

Lynn Hurst and Wasatch Steel, Inc. ("Wasatch"), appeal from a judgment issued by the Third Judicial District Court ruling that Wasatch converted property, entered into a civil conspiracy, and committed fraud in its dealings with Alta Industries Ltd. ("Steelco"). Steelco cross-appeals, claiming that the trial court erred in dismissing its claim for relief and for double damages under Utah's Pattern of Unlawful Activity Act (the "Act"), Utah Code Ann. §§ 76–10–1601 to –1609 (Supp.1987),[1] and its claim for treble damages pursuant to Utah's receiving stolen property statute,

---

**1.** Steelco brings this action under the Act as amended in 1987. *See* 1987 Utah Laws ch. 238, § 3. Since these amendments, minor changes have been made that will be noted where applicable. Prior to the 1987 amendments, the Act was known as Racketeering Influences and Criminal Enterprise Act, or "RICE." Although several of the unlawful activities alleged took place prior to the 1987 amendments, the 1987 version is applicable because a number of the acts took place after the 1987 amendments went into effect. Section 76–10–1609 provides:

> The amendments to the Utah Pattern of Unlawful Activity Act are prospective in nature and apply only to civil causes of action accruing after the date of this act. However, crimes committed prior to the effective date of this act may comprise part of a pattern of

Utah Code Ann. §§ 76–6–408 and –412. We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

On April 11, 1989, Steelco sued Wasatch, alleging claims for fraud, conversion, conspiracy, receiving stolen property, and a pattern of unlawful activity. Steelco based these claims on two general allegations: first, that from 1983 to 1987, Wasatch purchased approximately one hundred loads of steel at reduced prices from Volma Heaton, an employee of Steelco, knowing that Heaton had stolen the steel from Steelco, and second, that Wasatch paid Heaton and another Steelco employee, Chris Williams, kickbacks for inducing Steelco to purchase steel from Wasatch at fraudulently inflated prices.

At a bench trial in September of 1990, Steelco presented most of its evidence through the testimony of Heaton and Williams, who were parties to all of the transactions in question. Much of this testimony conflicted with the testimony of Lynn Hurst, the vice president and general manager of Wasatch. The trial court resolved this conflict in favor of Steelco; the facts are recited in light of this determination.[2]

Steelco is in the business of purchasing large orders of new steel from mills, reselling the steel, and fabricating the steel by bending and cutting it to customers' specifications. The process of fabrication generates two by-products: "remnant," steel cuttings large enough to be reused as new steel, and "scrap," steel cuttings too small for reuse.

Heaton, the superintendent at Steelco's plant, testified that on more than one hundred occasions, he stole remnant steel from Steelco and sold this steel to Wasatch. Wasatch is a closely held corporation that buys and sells both new and used steel. In selling the stolen steel, Heaton dealt solely with Hurst. In addition to being Wasatch's vice president and general manager, Hurst is a member of Wasatch's board of directors and owner of 15 percent of the company's capital stock.

Wasatch purchased the steel at prices far below the market value. Hurst personally paid Heaton for this steel, and on the occasions when Hurst visited Steelco's plant to select the steel he wished to purchase, the steel was delivered in Steelco trucks and the weight tickets delivered to Wasatch indicated that Steelco owned the steel.

Hurst did not deal with any Steelco management personnel other than Heaton. When the two men met at Steelco's plant, Hurst never gave the receptionist his company's name and the meetings always took place behind closed doors. The delivery of the stolen steel generally took place off-hours, when no management personnel other than Heaton would normally be present. Furthermore, Heaton testified that on multiple occasions, he told Hurst that Steelco must not know of the sale of the steel, and Hurst agreed to keep the purchases secret.

Heaton also testified that on eight occasions, he entered into agreements with Hurst whereby Heaton would cause Steelco to purchase steel from Wasatch at an inflated price on the express condition that Wasatch would pay Heaton a portion of the sales price. Hurst admitted making four of these payments to Heaton as "commissions," and Wasatch's records noted these payments. However, the paperwork and

unlawful activity if at least one of the criminal episodes comprising that pattern occurs after the effective date of this act and the pattern otherwise meets the definition of pattern of unlawful activity as defined in § 76–10–1602.

**2.** An appellate court does not give factual determinations made by a trial judge the same amount of deference given to factual determinations made by a jury—that is, an appellate court does not, as a matter of course, resolve all conflicts in the evidence in favor of the appellee. *State v. Walker,* 743 P.2d 191, 193 (Utah 1987) (citing Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2585 (1971)). However, in the instant case, because we uphold the trial judge's findings, it is appropriate to recite the evidence that supports those findings.

invoices Wasatch sent to Steelco concerning these purchases did not mention the payment made to Heaton. Chris Williams, another Steelco employee, testified that on at least three occasions, she entered into similar agreements with Hurst.

In a memorandum decision, the trial court ruled in favor of Steelco on its fraud, conspiracy, and conversion claims but dismissed Steelco's remaining claims. Although the memorandum contained findings of fact and conclusions of law, the court expressly noted that the memorandum was not intended as the final decision. The court ordered Steelco to prepare additional findings of fact and conclusions of law. Thereafter, Steelco submitted proposed findings and conclusions, Wasatch filed objections to several of the proposed findings, and the court conducted a hearing on Wasatch's objections. The court ultimately adopted the proposed findings, which include the following:

13. Lynn Hurst and Wasatch Steel Inc. should have known, and did know, that Heaton was stealing the steel materials from Steelco that Heaton was, in turn, delivering and reselling to Wasatch Steel Inc.

14. Volma Heaton, on the one hand, and Lynn Hurst and Wasatch Steel Inc., on the other hand, combined, conspired, and agreed that Volma Heaton would, over time, steal steel materials from Steelco and deliver them to Wasatch Steel Inc. and that Wasatch Steel Inc. would pay to Heaton a fraction of the value of the steel. Wasatch Steel Inc. would then resell the stolen steel at a significant profit, which was used in the business of Wasatch Steel Inc. Heaton, Wasatch Steel Inc., and Hurst agreed that the object to be accomplished was to obtain Steelco's steel so that Wasatch Steel Inc. and Heaton could both receive compensation and profit from it.

. . . .

18. Wasatch Steel Inc. and Hurst intentionally exercised dominion and control over the stolen steel that was stolen by Heaton from Steelco and delivered to Wasatch Steel Inc. Hurst and Wasatch Steel Inc. intended to take, and did take, possession of the stolen steel and intended to resell, and did resell, the stolen steel to others.

. . . .

33. With respect to the kickback transactions in which Volma Heaton participated, Heaton and Lynn Hurst discussed the nature of the steel material to be purchased by Steelco from Wasatch Steel Inc. and agreed upon both the amount to be paid by Steelco for that material and the amount to be paid by Wasatch Steel Inc. to Heaton as a kickback for his causing Steelco to purchase the material at that price. In all instances when Heaton received a kickback from Wasatch Steel Inc., Steelco paid at least the amount of the kickback more for the steel in question than it would have paid but for the kickback arrangement. The steel that was sold by Wasatch Steel Inc. to Steelco and with respect to which a kickback was paid to Heaton was not competitively priced, was not worth what Steelco paid for it, and, in some instances, the steel was [sic] delivered was substandard and unsuitable for its intended purpose. Wasatch Steel Inc. and Hurst paid Heaton kickbacks for the purpose of inducing Heaton to influence the conduct of Steelco to purchase the steel in question at a price profitable to Wasatch Steel Inc....

34. In those transactions where Chris Williams received a kickback from Wasatch Steel Inc. or Hurst, Chris Williams contacted Hurst to order a prescribed quantity and kind of steel material for Steelco. Hurst would tell Williams the price that Wasatch Steel Inc. would have to receive for the material. Williams would then instruct Hurst, and Hurst would agree, to charge Steelco some margin in addition to his initially quoted price for the steel in question, and Williams and Hurst agreed to split that additional markup amount between them

in certain proportions. After the purchase transaction was effected, Hurst and Williams in fact split between them the extra margin that Steelco was charged, with Hurst receiving approximately 20% and Williams receiving approximately 80% of the additional margin. Wasatch Steel Inc. paid Chris Williams kickbacks for the purpose of inducing Chris Williams to influence the conduct of Steelco to purchase the steel in question at a price profitable to Wasatch Steel Inc.

On appeal, Wasatch raises numerous claims concerning, inter alia, sufficiency of the evidence, statute of limitations, and calculation of damages. Steelco cross-appeals, claiming that the court erred in dismissing its claims for liability and double damages pursuant to Utah's Pattern of Unlawful Activity Act and for treble damages pursuant to Utah's receiving stolen property statute. We affirm the decision of the trial court, except that we hold that the court erred in dismissing Steelco's pattern of unlawful activity claim and in its award of punitive damages.

## I. FINDINGS OF FACT

██ Wasatch bases many of its claims in whole or in part on challenges to the trial court's findings of fact. A trial court's factual findings are given deferential review. Utah Rule of Civil Procedure 52(a) provides, "Findings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Wasatch, however, argues that this deferential standard should not be employed in the instant case because the trial court mechanically adopted the proposed findings submitted by Steelco.

In support of this contention, Wasatch cites *Boyer Co. v. Lignell.* [3] In *Boyer*, this court stated that trial courts should not " 'mechanically adopt' the findings as prepared by the prevailing party." [4] We did not, however, determine how we would review findings proposed by the prevailing party and summarily adopted by the trial court because we concluded that the court took an active role in the preparation of the findings. [5] In so concluding, we relied on the fact that prior to adopting the prevailing party's findings, the court considered the opposing party's objections and proposed amendments and conducted a hearing on the propriety of the proposed findings. [6]

In the instant case, the trial judge took a more active role in preparation of the findings than did the trial judge in *Boyer*. Not only were objections filed and a hearing conducted, but the trial judge prepared an initial memorandum decision containing findings of fact before instructing Steelco to prepare additional findings consistent with his decision. Clearly, the trial court did not mechanically adopt the findings, and therefore, the findings are entitled to the normal deference accorded by rule 52(a).

██ Wasatch also claims that regardless of the degree of deference given the trial judge's factual determinations, the evidence offered at trial is insufficient to support the court's findings. A party seeking to set aside a trial court's findings carries a heavy burden: "To mount a successful challenge to the correctness of a trial court's findings of fact, an appellant must first marshal all the evidence supporting the finding and then demonstrate that the evidence is legally insufficient to support the findings even in viewing it in the light most favorable to the court below." [7]

Wasatch's brief contains a long section purporting to summarize the evidence of-

---

3. 567 P.2d 1112 (Utah 1977).

4. *Id.* at 1113.

5. *Id.* at 1113–14.

6. *Id.* at 1114.

7. *Reid v. Mutual of Omaha Ins.,* 776 P.2d 896, 899 (Utah 1989); *see also Grayson Roper Ltd. v. Finlinson,* 782 P.2d 467, 470 (Utah 1989); *In re Estate of Bartell,* 776 P.2d 885, 886 (Utah 1989) (mem.).

fered at trial. However, although Wasatch cites some evidence that supports the court's findings, even a cursory review of the record reveals that Wasatch frequently omits crucial and incriminating evidence and cites testimony offered by Wasatch without reference to conflicting testimony offered by Steelco. Because Wasatch has clearly failed to carry its burden of marshaling the evidence, the trial court's findings will not be disturbed.[8]

## II. PATTERN OF UNLAWFUL ACTIVITY ACT

In determining whether the trial court erred in dismissing Steelco's pattern of unlawful activity claim, we begin by analyzing the relevant statutory provisions. Subsection 76–10–1605(1) of the Act provides that a business injured "by a person engaged in conduct forbidden by any provision of § 76–10–1603 may sue in an appropriate district court and recover twice the damages ... he [or she] sustains." Section 76–10–1603 defines unlawful acts, and subsection 76–10–1603(3) provides, "It is unlawful for any person employed by or associated with any enterprise to conduct or participate, whether directly or indirectly, in the conduct of that enterprise's affairs through a pattern of unlawful activity."[9]

The key terms in subsection 76–10–1603(3) are "enterprise" and "pattern of unlawful activity," which are defined in section 76–10–1602 as follows:

(2) "Enterprise" means any individual, sole proprietorship, partnership, corporation, business trust, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, and includes illicit as well as licit entities.

(3) "Pattern of unlawful activity" means engaging in conduct which constitutes the commission of at least three episodes of unlawful activity, which episodes are not isolated, but have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics. Taken together, the episodes shall demonstrate continuing unlawful conduct and be related either to each other or to the enterprise.[10]

Finally, "unlawful activity" is defined in section 76–10–1602 and "means to directly engage in conduct or to solicit, request, command, encourage, or intentionally aid another person to engage in conduct which would constitute" one of the crimes enumerated in subsections 76–10–1602(1)(a) to (zzz).

In its initial memorandum, the trial court dismissed Steelco's pattern of unlawful activity claim, ruling:

The acts of the parties herein do not bring them within the [pattern of unlawful activity] act. The necessary requirements are not met. The Court finds that for the act to apply, there must be three similar episodes that involve separate

---

**8.** *See Grayson Roper Ltd.,* 782 P.2d at 470–71; *see also Heslop v. Bank of Utah,* 839 P.2d 828, 839 (Utah 1992) (recital of evidence favorable to appellant insufficient to carry burden of marshaling evidence in appeal from jury trial); *Ashton v. Ashton,* 733 P.2d 147, 150 (Utah 1987) (challenge to trial court's findings failed because appellant did not marshal evidence).

**9.** Section 76–10–1603 also provides that the following conduct constitutes "unlawful acts":

(1) It is unlawful for any person who has received any proceeds derived, whether directly or indirectly, from a pattern of unlawful activity in which the person has participated as a principal, to use or invest, directly or indirectly, any part of that income, or the proceeds of the income, or the proceeds de-

rived from the investment or use of the proceeds, in the acquisition of any interest in, or the establishment or operation of, any enterprise.

(2) It is unlawful for any person through a pattern of unlawful activity to acquire or maintain, directly or indirectly, any interest in or control of any enterprise.

. . . .

(4) It is unlawful for any person to conspire to violate any provision of Subsection (1), (2), or (3).

**10.** The current versions of section 76–10–1602(2) and (3) are codified at section 76–10–1602(1) and (2), respectively.

and different entities, and not within the same entity.

In addition, the findings submitted by Steelco and adopted by the court include the following: "Plaintiffs did not prove the existence of three similar episodes of unlawful activity that involve separate and different entities."

■ These rulings are in error. While subsection 76–10–1602(3) requires the commission of at least three episodes of unlawful activity, the Act does not require three separate entities. The term "entity" does not even appear in the statute. Furthermore, while the Act requires the existence of an enterprise, section 76–10–1603 expressly provides that the existence of one enterprise is sufficient to invoke liability under the Act. Indeed, our case law establishes that the Act requires proof of only a single enterprise.[11]

■ In many cases, once a trial court has erred in interpreting a statute, it is necessary to remand so that the court can make adequate findings in light of the correct interpretation. However, the record in the instant case contains findings concerning every statutory element. Therefore, we may proceed with a statutory analysis and determine Wasatch's liability as a matter of law.[12]

Initially, we note that the Act imposes criminal as well as civil liability and all of the predicate acts, or "unlawful activities," are crimes prohibited by Utah's criminal code. However, subsection 76–10– 1605(1)(b) provides that civil liability may attach regardless of whether "the conduct has been adjudged criminal by any court of the state or of the United States," and it is not necessary to prove the existence of an unlawful activity beyond a reasonable doubt. Rather, subsection 76–10–1605(5) provides, "In all actions arising under [the civil liability] section, the burden of proof is clear and convincing evidence." In the instant case, the trial court expressly ruled that it based its findings on clear and convincing evidence.[13]

■ We turn first to Steelco's argument that by purchasing steel that he knew to be stolen, Hurst engaged in unlawful activity. Subsection 76–10–1602(1)(n) provides in part that it is an unlawful activity to directly engage in conduct constituting the offense of receiving stolen property as defined in Utah Code Ann. § 76–6–408. That section provides, "A person commits theft if he [or she] receives, retains, or disposes of the property of another knowing that it has been stolen ... with the purpose to deprive the owner thereof." Given the trial court's finding that Hurst purchased the steel knowing that it was stolen from Wasatch and sold this steel to third persons, Hurst obviously engaged in unlawful activity as defined by subsection 76–10– 1602(1)(n).

We turn next to Steelco's claim that in paying kickbacks to Heaton and Williams to induce them to cause Steelco to purchase steel from Wasatch at inflated prices, Hurst engaged in unlawful activity. Sub-

11. *See State v. McGrath,* 749 P.2d 631, 637 (Utah 1988). *McGrath* was a criminal case brought under the Act in which we held that the existence of an enterprise was shown by evidence that McGrath in fact had an association with one Marcus by virtue of the fact that Marcus, a purveyor of controlled substances, regularly purchased illicit drugs from McGrath with the intent to resell them. It is axiomatic that statutory language imposing both civil and criminal liability cannot be interpreted to require stricter requirements in a civil context than it does in a criminal context.

*McGrath* did not deal with the Pattern of Unlawful Activity Act but with its predecessor, the RICE statute. However, the definition of enterprise is identical under both acts. *See* Utah Code Ann. § 76–10–1602(3) (1981).

12. *See State v. Petersen,* 810 P.2d 421, 425 (Utah 1991); *Provo City Corp. v. Willden,* 768 P.2d 455, 456 (Utah 1989).

13. Although the court dismissed the pattern of unlawful activity claim, a clear and convincing burden was necessary to find for Steelco on its fraud and conspiracy claims. *See Utah State Dep't of Social Servs. v. Pierren,* 619 P.2d 1380, 1381–82 (Utah 1980); *Crane Co. v. Dahle,* 576 P.2d 870, 872 (Utah 1978).

section 76–10–1602(1)(s) provides in part that it is unlawful to engage in activity constituting the offense of bribery of a person in the business of selecting goods, as defined in Utah Code Ann. § 76–6–508. That section provides, "A person is guilty of [bribery] when, without the consent of the employer ... contrary to the interests of the employer ...: (a) He [or she] confers ... upon the employee ... any benefit with the purpose of influencing the conduct of the employee ... relating to his [or her] employer's ... affairs[.]"

The trial court's findings concerning the kickback arrangements address each of the elements set forth in section 76–6–508. Therefore, all of the acts proven with respect to Steelco's fraud, conversion, and conspiracy claims constitute unlawful activity as defined by section 76–10–1602.

The trial court's findings also establish a pattern of unlawful activity as defined by subsection 76–10–1602(3). The findings establish that more than one hundred episodes of unlawful activity took place within a four-year period. All of these episodes were interrelated, involving the same victim, similar participants, and one of two methods of commission.[14] Furthermore, all the episodes were related to an enterprise, Wasatch Steel, as defined in section 76–10–1602(2).[15] Indeed, the trial court's findings establish that the unlawful activities were committed by Wasatch's general manager in the course of his employment and that Wasatch was the primary beneficiary of the unlawful activity.

We therefore conclude that Hurst, an employee of an enterprise, participated in the conduct of the affairs of that enterprise through a pattern of unlawful activity. Hurst's conduct, therefore, constitutes unlawful acts, as defined by section 76–10–1603(3). Because Steelco was injured by these unlawful acts, it is entitled to damages under section 76–10–1605.

■ As we have stated, subsection 76–10–1605(1) entitles Steelco to recover twice the damages it sustained. Furthermore, subsection 76–10–1605(4) provides that liability for double damages extends beyond Hurst to Wasatch because the "pattern of unlawful activity alleged and proven as part of the cause of action was ... undertaken ... by ... a high managerial agent acting within the scope of his employment."[16]

However, an issue remains concerning the calculation of the damages Steelco sustained. Section 76–10–1605 does not provide a method for calculating actual damages. Furthermore, all of the predicate acts, or unlawful activities, under the Act are crimes, not civil causes of action. Ac-

---

**14.** We upheld a criminal conviction under the RICE act where the defendant engaged in a pattern of unlawful activity by participating in seventy-four wholesale illicit drug transactions with one other person. *See McGrath,* 749 P.2d at 637. The court of appeals also upheld a criminal conviction under the RICE act after finding that the defendant engaged in a pattern of unlawful activity by participating in bribery on seven different occasions. *See State v. Thompson,* 751 P.2d 805, 817 (Utah Ct.App. 1988), *rev'd on other grounds,* 810 P.2d 415 (Utah 1991). The only material difference between the RICE act's definition of pattern of unlawful activity and the Pattern of Unlawful Activity Act's definition is that RICE required two, as opposed to three, unlawful acts. *See* Utah Code Ann. § 76–10–1602(4) (1981).

**15.** We have recognized the existence of an enterprise on considerably less evidence than that presented in this case. *See McGrath,* 749 P.2d at 637. For a discussion of the necessity of an enterprise, see *State v. Bell,* 770 P.2d 100, 103 n. 2 (Utah 1988).

**16.** Subsection 76–10–1605(4) provides:

In all actions under this section, a principal is liable for actual damages for harm caused by an agent acting within the scope of his [or her] employment or apparent authority. A principal is liable for double damages only if the pattern of unlawful activity alleged and proven as part of the cause of action was authorized, solicited, requested, commanded, undertaken, performed, or recklessly tolerated by the board of directors or a high managerial agent acting within the scope of his [or her] employment.

Wasatch does not contest that Hurst was acting within his actual authority as general manager and vice president of Wasatch in his dealings with Heaton and Williams nor that Wasatch was the primary beneficiary of those dealings.

cordingly, we must look outside the Act to determine a method of calculating actual damages.

■ Persons injured by criminal conduct generally have civil remedies available to them. Therefore, an applicable civil cause of action can be used as a guide in calculating damages under the Act. In the instant case, because the elements of civil conspiracy are subsumed in the crime of bribery proven in this case, the damage calculation applicable to a civil conspiracy can be used to arrive at the actual damages Steelco sustained due to the kickback arrangements.[17] Similarly, because the elements of conversion are subsumed in the crime of receiving stolen property proven in this case, the damage calculation applicable to conversion can be used to arrive at the actual damages Steelco sustained because of the theft of the steel.[18]

The trial court awarded Steelco damages on the bases of fraud, in connection with the kickback scheme, and conversion, in connection with the steel theft. Those damages may also be used to arrive at the damages Steelco sustained as a result of the pattern of unlawful activity. However, Wasatch claims that the trial court erred in calculating the damages on Steelco's conversion claim.

The trial court awarded Steelco the amount of money received by Wasatch from the sale of the steel plus interest. Wasatch concedes that the "measure of damages for conversion when the property is not returned is the market value of the

property at the time of conversion, plus interest."[19] Wasatch claims that the appropriate market for a retailer of steel is the wholesale market, not the retail market, and therefore, Steelco was only entitled to recover its replacement costs.

In support of its contention, Wasatch relies on section 911, comment d of the Restatement (Second) of Torts (1977), which provides:

> d. *Wholesale or retail value.* From the time when a chattel is manufactured to the time of its actual use, there may be many markets in which it is sold. Thus, different prices are paid by the wholesaler, the retail dealer and the consumer. Since the measure of recovery is determined by the harm done, the market that determines the measure of recovery by a person whose goods have been taken … is that to which he would have to resort in order to replace the subject matter. Thus, the consumer can recover the retail price; the retail dealer, the wholesale price. The manufacturer, who does not buy in a market, receives his selling price. Damages for the profits that the wholesale dealer or the retail dealer would normally anticipate from a sale are not ordinarily allowed. However, … the dealer … is entitled to damages for any harm done to his business through his inability to obtain substitutes and thus satisfy his customers.

However, because Wasatch disposed of the converted steel, other provisions of section 927 of the Restatement provide for three additional measures of damages. The first

---

17. To prove civil conspiracy, five elements must be shown: "(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof." *Israel Pagan Estate v. Cannon,* 746 P.2d 785, 790 (Utah Ct.App.1987) (citations omitted); *see also Crane Co.,* 576 P.2d at 872. The trial court's findings of fact concerning the kickback arrangements clearly satisfy the elements of conspiracy.

18. Conversion requires "an intent to exercise dominion or control over goods inconsistent with the owner's rights." *Allred v. Hinkley,* 8 Utah 2d 73, 328 P.2d 726, 728 (1958). The trial court's findings concerning the theft of steel satisfy these elements.

19. *Madsen v. Madsen,* 72 Utah 96, 269 P. 132, 134 (1928), *quoted in Henderson v. For–Shor Co.,* 757 P.2d 465, 468 (Utah Ct.App.1988); *see also Columbia Trust Co. v. Farmers' & Merchants' Bank,* 82 Utah 117, 22 P.2d 164, 167 (1933).

is the "value of the subject matter ... at the time and place of the conversion."[20] The second is "the value of the chattel at the time of disposition."[21] The third is "the amount received by the converter, if the disposal was with knowledge that it was wrongful."[22] By affording an election of the measure of damages, the law allows a plaintiff to maximize recovery and thus prevent a converter from profiting from wrongful acts.[23]

█ In this case, Steelco sought, and the trial court awarded, the amount of the money Wasatch received from sales of the converted steel. Steelco was entitled to elect this measure of damages because the trial court determined that the conversion and disposal of the steel were made with knowledge that they were wrongful. Inasmuch as this measure of damages required the court only to ascertain the amount of money Wasatch made on the sale of the steel, section 911 of the Restatement has no application in this case.

Because the trial court erred in dismissing Steelco's claim under the Act, Steelco is entitled to twice the damages it sustained. We hold that the measure of damages is twice the amount Wasatch received for the sale of the steel plus interest.

█ Wasatch further claims that the court erred in awarding Steelco attorney fees. However, subsection 76–10–1605(2) expressly provides for the award of reasonable attorney fees to the party prevailing in a suit brought under the Act. Therefore, the award of attorney fees was proper.

Wasatch also contends that various statutes of limitation bar portions of Steelco's claims. This argument also fails. Subsection 76–10–1605(9) provides, "An action or proceeding brought under this section shall be commenced within three years after the conduct prohibited by § 76–10–1603 terminates or the cause of action accrues, which-

ever is later. This provision supersedes any limitation to the contrary." Both the trial court's findings and the record establish that this suit was brought within the three-year period.

## III. REMAINING DAMAGE ISSUES

█ Steelco contends that the trial court erred in dismissing its claims for treble damages pursuant to Utah Code Ann. § 76–6–408(2)(d) and –412(2). Subsection 76–6–412(2) provides, "Any person who has been injured by a violation of Subsection 76–6–408(1) may bring an action against any person mentioned in Subsection 76–6–408(2)(d) for three times the amount of actual damages...." Subsection 76–6–408(1) imposes criminal liability for knowingly receiving stolen property, and subsection 76–6–408(2)(d) provides:

(2) The knowledge or belief required for paragraph (1) is presumed in the case of an actor who:

...;

(d) Is a pawnbroker or person who has or operates a business dealing in or collecting used or secondhand merchandise or personal property ... and fails to require the seller ... to certify, in writing, that he [or she] has the legal rights to sell the property. If the value given for the property exceeds $20 the pawnbroker or person shall also require the seller or person delivering the property to obtain a legible print, preferably the right thumb....

The trial court properly dismissed this claim, ruling that "[s]ection 76–6–408(2)(d) does not contemplate a business such as Wasatch Steel Inc. and its activities." The plain meaning of the statute limits its application to pawnbrokers and similar businesses that generally deal in small purchases of secondhand consumer goods. It does not include businesses that regularly deal

---

**20.** *Id.* § 927(1)(a).

**21.** *Id.* § 927 cmt. i.

**22.** *Id.*

**23.** *See* Restatement of Restitution § 151 (1936).

in large bulk orders of raw industrial material.[24]

Wasatch also claims that by signing an agreement with Heaton not to sue without expressly reserving the right to sue others, Steelco released Wasatch from all claims. However, while Wasatch raised this claim in its amended answer, a review of the record reveals that the claim was not pursued at trial.[25] Therefore, this issue was not addressed at the trial level.[26] With limited exceptions, our practice has been to decline consideration of issues argued for the first time on appeal.[27] Accordingly, we do not address this claim.

 Wasatch's final claim is that the trial court erred in awarding $100,000 in punitive damages. Given our holding as to the applicability of the Act and the punitive nature of the double damages awarded pursuant thereto, Steelco is, in effect, the recipient of a dual punitive damage award. Since both punitive damage awards are based upon the same set of facts, Steelco is not entitled to the separate amount. As a consequence, we vacate and set aside the $100,000 award.

We have duly considered the remainder of the claims raised by the parties and find them to be without merit.[28] Accordingly, we reverse the trial court's ruling dismissing Steelco's claim for double damages under Utah's Pattern of Unlawful Activity Act and vacate the punitive damage award. We remand for entry of judgment doubling the actual damages sustained for conversion of the steel. The trial court's ruling

dismissing Steelco's receiving stolen property claim is affirmed.

HOWE, Associate C.J., and STEWART, DURHAM and ZIMMERMAN, JJ., concur.

will not consider on appeal issues which were not submitted to the trial court and concerning which the trial court did not have the opportunity to make any findings of fact or law.

*Id.* at 672 (citations omitted).

---

24. *See Millett v. Clark Clinic Corp.,* 609 P.2d 934, 936 (Utah 1980) (statutes are interpreted to avoid absurd results).

25. Wasatch alleges that the trial court did not allow Wasatch to pursue this claim. However, the record does not support this contention.

26. See *Turtle Management, Inc. v. Haggis Management, Inc.,* 645 P.2d 667 (Utah 1982), wherein we stated:
    The defendants' contention ... was raised as a defense in their answer, but no argument was made to the district court on this issue and no evidence was presented. This court

27. *Espinal v. Salt Lake City Bd. of Educ.,* 797 P.2d 412, 413 (Utah 1990); *Pratt v. City Council,* 639 P.2d 172, 173–74 (Utah 1981).

28. *See State v. Carter,* 776 P.2d 886, 896 (Utah 1989).