2002 UT 121

Patrick HOGLE; Salt Lake, Garfield & Western Railway Company, a Utah corporation; Ronald A. Johnson; J.W. Gallivan Children's Trust; H. Mack Brown; Jeff Owen; and Claire A. Singleton, Plaintiffs and Appellants,

v.

ZINETICS MEDICAL, INC., a Utah corporation; and Medtronic, Inc., a Minnesota corporation, Defendants and Appellees.

Zinetics Medical, Inc., Plaintiff and Appellee,

v.

Ayyoob Abbaszadeh, Kenneth Anderson, Richard Belliston, et al., Defendants and Appellants.

No. 20000470.

Supreme Court of Utah.

Dec. 13, 2002.

Robert A. Peterson, Rebecca S. Parr, Karen L. Martinez, Salt Lake City, for plaintiffs and Ayyoob Abbaszadeh.

William Z. Pentelovitch, Alain M. Baudry, Minneapolis, MN, and Brent E. Johnson, James L. Barnett, Salt Lake City, for Zinetics and Medtronic.

HOWE, Justice:

## INTRODUCTION

¶ 1 Minority shareholders of Zinetics Medical, Inc., dissenting from the forced purchase of their shares by the parent corporation, Medtronic, Inc., appeal from the district court's valuation of minority shares at less than 4.528 cents per share under Utah Code Ann. section 16–10a–1302. They contend that the court failed to consider all relevant factors and failed to explain the basis for its valuation.

## BACKGROUND

¶ 2 Zinetics Medical, Inc., was first incorporated under another name in 1983. Despite several years of financial struggle, the company developed and brought to market a specialized catheter designed for use in diagnostic equipment manufactured by others. In 1991, Zinetics' directors approved the sale of 81% of the company's common stock shares to Synectics, a Swedish company, for $255,000. With access to Synectics' worldwide distribution network and customer base, Zinetics began to prosper. Beginning in 1992, the company experienced steady revenue and profitability increases.

¶ 3 In 1996, Medtronic, Inc., acquired 100% of Synectics. Almost immediately disagreements arose between Medtronic and the Zinetics minority shareholders (the Minority) over the management and future direction of Zinetics. The Minority desired to expand the product line and develop Zinetics as a stand-alone company with an independent market. It was their perception that Medtronic preferred to keep Zinetics as a "captive" original equipment manufacturer bolstering Medtronic's performance by supplying low cost catheters for Medtronic affiliates to incorporate into their products and then sell at a substantial markup.

¶ 4 Medtronic commenced attempts to buy out the Minority, first offering 1.75 cents per share. The Minority offered to buy out Medtronic's shares of Zinetics at the same price. Medtronic then offered 3.6 cents per share. The Minority refused this offer, believing that it did not reflect the true value of the company, and again offered to buy Medtronic's shares at the same price. In October of 1997, the Minority offered to purchase 80% of Medtronic's 81% interest, or approximately 60% of Zinetics stock, for $3,875,000 paid over time. This offer included an exclusive supply and distribution agreement, providing Medtronic with continued access to Zinetics products.

¶ 5 Medtronic representatives scheduled a meeting with the Minority's representatives for January 23, 1998, ostensibly to finalize the terms of the stock purchase. However, on January 20, 1998, Medtronic presented an Agreement and Plan of Reorganization under which Medtronic would pay the Minority 4.528 cents per share and become 100% owner of Zinetics. The Minority made a final attempt to buy out Medtronic at ten cents per share in an offer including a non-exclusive supply and distribution agreement. Medtronic representatives rejected the offer purportedly because it lacked an exclusive supply agreement. Further negotiations proved unavailing, and Medtronic proceeded with a forced merger.

¶ 6 The Minority voted against the merger and exercised their dissenters' rights under section 16–10a–1302 of the Revised Business Corporations Act, Utah Code Ann. §§ 16–10a–101 to –1705 (Supp.1995). Medtronic filed a petition for a determination of fair value under section 16–10a–1330. Both parties provided expert valuations. Neither party submitted evidence of asset value, but both submitted calculations using the market and the investment valuation methods. After weighting and averaging the results of the two methods, Medtronic's expert, Merrill R. Norman, fixed a value of 1.97 cents per share. The Minority's expert, Robert F. Reilly, determined the Zinetics stock to be worth 18 cents per share.

¶ 7 The Minority submitted evidence of Zinetics' performance and argued that rather than continuing Zinetics' current growth trends into the future, Norman's projections inexplicably broke with and undercut the trends. Notably, although Zinetics' total revenues had increased since 1993 at a compounded annual growth rate of 19.3%, Norman set the 1998 adjusted earnings that served as a basis for his forward projections at a figure 15% lower than the 1997 adjusted earnings. Furthermore, Zinetics' performance during the period following the merger significantly outstripped Norman's projections and exceeded even Reilly's more optimistic figures.

¶ 8 Reilly relied on two sets of projections supplied by Zinetics' president, Steve Davis. Reilly also prepared a third set of projections based on Davis' deposition and on information from the previous projections. Respectively, these projections predicted total revenues of $4,153,000, $3,918,000, and $3,190,000 for the 1998 fiscal year.

¶ 9 The district court issued a sixteen-page memorandum decision discussing Zinetics' structure and operations and the valuation methods used. After rejecting both parties' bases for determining fair value of the shares and adopting the investment valuation technique of Medtronic's expert, the district court concluded that "the fair value of Zinetics' common stock is less than $ .04528 per share and that, accordingly, respondents have received fair value for their stock." The Minority appeals and urges us to reject the district court's valuation and remand for a new value determination by a "special master."

### ANALYSIS

¶ 10 In this appeal, we must determine whether the district court properly determined fair value as defined in Utah Code Ann. section 16–10a–1301(4) and interpreted in *Oakridge Energy, Inc. v. Clifton*, 937 P.2d 130 (Utah 1997). "[W]hile the ultimate determination of fair value is a question of fact, the determination of whether a given fact or circumstance is relevant to fair value under [state law] is a question of law which we review de novo." *Swope v. Siegel–Robert,*

*Inc.*, 243 F.3d 486, 491 (8th Cir.), *cert. denied*, 534 U.S. 887, 122 S.Ct. 198, 151 L.Ed.2d 139 (2001).

### I. DID THE DISTRICT COURT PROPERLY DETERMINE THE FAIR VALUE OF THE MINORITY'S SHARES UNDER UTAH'S DISSENTERS' RIGHTS STATUTE?

¶ 11 The Utah dissenters' rights statute provides in relevant part that "the corporation shall pay the amount the corporation estimates to be the fair value of the dissenter's shares, plus interest to each dissenter" who meets the applicable requirements. Utah Code Ann. § 16–10a–1325(1) (1995). If the dissenter disagrees with the corporation's estimate of value, the corporation is obligated to petition the court for valuation under section 16–10a–1330. The dissenter is then entitled to judgment for any amount "by which the court finds that the fair value of his shares, plus interest, exceeds the amount paid by the corporation." *Id.* § 16–10a–1330(5)(a). Under the definition provided in section 16–10a–1301(4), " '[f]air value' with respect to a dissenter's shares, means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action."

¶ 12 Since 1991, Zinetics has been first a subsidiary of Synectics and later part of the Synectics package acquired by Medtronic. The parties, however, provided the court considerable discussion and speculation on the value, future, and prospects of Zinetics as a stand-alone company. The district court found "that Zinetics' intrinsic value would most likely be maximized as an affiliate of Synectics." The court relied for this finding on the undisputed fact that Zinetics first became profitable after affiliating with Synectics and obtaining the benefit of the parent company's "reliable market and effective distribution network."

¶ 13 The object of dissenters' rights legislation is to provide a dissenting minority with the fair value of the shares that they possess. *See* Utah Code Ann. § 16–10a–1301(4) (1995);

*Hunter v. Mitek Indus., Inc.*, 721 F.Supp. 1102, 1106–07 (E.D.Mo.1989) ("[T]he purpose of the appraisal statute is to award the dissenter the value of what he owned."). In this case, the Minority actually owned shares in a subsidiary company, not in a stand-alone company. Therefore, the district court's finding is a correct application of the statute.

¶ 14 This determination relates closely to the parties' dispute over the relevance of the Minority's offer to buy out Medtronic at ten cents per share. The Minority contends that the district court erred in giving no weight to that attempt. Medtronic counters that ten cents per share was a "sham offer" unsupported by evidence of feasible financing. The district court's memorandum decision makes no mention of the issue. However, in all of the parties' discussions, the fundamental premise of the purchase offer was that the erstwhile Minority would use its ownership control to recast Zinetics as a stand-alone catheter manufacturer. Therefore, what the Minority had to sell-minority shares in a subsidiary—and what it was attempting to buy-majority shares in a stand-alone company—were two significantly different items. Even investment bankers' opinions on the feasibility of obtaining financing for the buy-out would relate not to the value of the Minority's shares in hand, but rather to the prospects and value of Zinetics as a stand-alone company. Any inference of the value of the one from the value of the other would be entirely speculative, and the district court was correct in eschewing the attempt.

¶ 15 The Minority complained further that Medtronic suppressed Zinetics' value and opportunities by blocking development of new products and by refusing to foster the evolution of an independent market for Zinetics' shares. The minority additionally asserted that Medtronic had profited unfairly from excessive markups on Zinetics' products. Medtronic presented counter evidence of sound business judgment regarding product development and fair payment for the catheters and argued that any failure to promote an independent market for Zinetics' shares resulted from associated clerical burdens rather than from an attempt to suppress Zinetics. The district court found that "insufficient evidence exists to support a conclusion that decisions made by the Zinetics' Board of Directors while controlled by Synectics were improperly made with an eye toward repressing the value of Zinetics until the minority shareholders could be 'squeezed out.' "

¶ 16 Evaluating conflicting testimony is the proper role of the finder of fact. When an appellant asserts that the evidence is insufficient to support the lower court's findings of fact, "we do not weigh the evidence de novo." *In re Estate of Bartell*, 776 P.2d 885, 886 (Utah 1989). Rather, we accord great deference to the lower court's findings, "especially when they are based on an evaluation of conflicting live testimony." *Id.* at 886. Moreover, " '[t]o mount a successful challenge to the correctness of a trial court's findings of fact, an appellant must first marshal all the evidence supporting the finding and then demonstrate that the evidence is legally insufficient to support the findings even viewing it in the light most favorable to the court below.' " *Alta Indus. Ltd. v. Hurst*, 846 P.2d 1282, 1284 (Utah 1993) (quoting *Reid v. Mut. of Omaha Ins. Co.*, 776 P.2d 896, 899 (Utah 1989)). In the instant case, the record contains considerable evidence in support of the district court's findings, which the Minority has failed to marshal. Therefore, we do not disturb the district court's findings regarding the alleged suppression of Zinetics' opportunities and value.

¶ 17 The Minority contends that the district court erred in failing to consider the unique value of their shares to Medtronic. Courts have made it clear, however, that " ' "fair value" is not measured by any unique benefits that will accrue to the acquiring corporation, any more than the compensable value of property taken by eminent domain is measured by its special value to the condemnor.' " *Oakridge Energy*, 937 P.2d at 134 (quoting *In re Valuation of Common Stock of Libby, McNeill & Libby*, 406 A.2d 54, 62 (Me.1979)). Indeed,

[t]he appraisal proceeding is not at all concerned with the losses to the *particular* dissenting shareholders or with the benefits derived by the *particular* acquiring

corporation in the merger, except as those losses and benefits would be reflected in the price that would be bargained out in a completely free market between *any* willing buyer and *any* willing seller in the absence of the merger.

*Libby*, 406 A.2d at 62. Therefore, the district court was correct in declining to attempt to attribute any special value of the Minority's shares to Medtronic.

## II. DID THE DISTRICT COURT ADEQUATELY CONSIDER THE OAKRIDGE ENERGY VALUATION FACTORS?

¶ 18 This court noted in *Oakridge Energy* that the three most recognized and relevant elements of fair value for stock valuation purposes are asset value, market value, and investment value. 937 P.2d at 132. We held that "although '[a]ll three components of "fair value" may not influence the result in every valuation proceeding, yet all three should be considered.'" *Id.* at 135 (quoting *Libby*, 406 A.2d at 60).

¶ 19 In the instant case, neither party submitted evidence of asset value. Each party's valuation expert submitted estimates of market value and of investment value, referred to by the parties here as "income value."[1] However, the court rejected both parties' market valuations and the Minority's investment valuation. Consequently, the court based its entire valuation on Medtronic's determination of investment value. We examine the court's approach for correctness, noting again that choice of valuation methods is a question of law. *Swope*, 243 F.3d at 491.

### A. Asset Value

¶ 20 The district court had no evidence of asset value before it, and neither party contested the court's disregard of this factor. As justification for ignoring asset value, the district court cited *Hansen v. 75 Ranch Co.*, 288 Mont. 310, 957 P.2d 32, 42 (1998) ("[C]ourts have noted that unless the corporation is undergoing an actual liquidation, the liquidation method is not an ap-

propriate method of valuing shares of a dissenting shareholder."). Other courts have also emphasized that in the absence of actual liquidation a corporation must be valued as a going concern.

¶ 21 The Iowa Supreme Court, in *Woodward v. Quigley*, 257 Iowa 1077, 133 N.W.2d 38 (1965), stated that "[i]n this particular case we are not seriously handicapped by the absence of satisfactory evidence of net asset value. Here, as in most instances, investment value is of much greater importance." *Id.* at 42; *see also Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 299 (Del.1996) (stating that an understatement of fair value may result from failure to value company as a going concern); *Friedman v. Beway Realty Corp.*, 87 N.Y.2d 161, 638 N.Y.S.2d 399, 661 N.E.2d 972, 976 (1995) (stating that a determination of fair value of dissenters' shares should be based on their worth in a going concern, not in liquidation); *Elk Yarn Mills v. 514 Shares of Common Stock*, 742 S.W.2d 638, 642 (Tenn.Ct.App.1987) (noting that the overwhelming weight of authority approves valuation of the assets of the corporation as a going concern).

¶ 22 Minority shareholders owned stock in a going concern, and liquidation was not a prospect. Zinetics was primarily a manufacturing rather than a property-based corporation. Therefore, we conclude that *Oakridge Energy* did not require the district court to consider asset value where the parties had adduced none.

### B. Market Value

¶ 23 Zinetics was listed on a non-NASDAQ over-the-counter stock exchange and had experienced some trading prior to the merger. However, Norman attacked the validity of the trades, and Reilly acknowledged that Zinetics was too thinly traded for its own stock price to serve as a reliable indicator of market value. Therefore, the experts attempted to select companies comparable to Zinetics as guidelines.

¶ 24 The district court noted that this "is a method which has not been recog-

---

**1.** This is another term for the same valuation model that the courts have referred to as invest-

ment value. We use the terms interchangeably here.

nized as a valuation tool by our courts." It added, however, that it did not "interpret *Oakridge Energy* to restrict a fair value analysis to the three methodologies approved in [that] decision." We note that the selection of guideline companies was part of the determination of market value, which is one of the three primary valuation models. *Oakridge Energy* does not exclude reliable and rational methods for determining asset, market, or investment value that were not before the court in that case.

¶ 25 In the instant case, however, the district court observed that "[n]either expert could discover even one company which could reasonably be characterized as 'comparable' to Zinetics." Medtronic's expert, Norman, chose a mixture of companies in the medical device field, including several extremely large organizations very dissimilar to Zinetics, notably Abbott Laboratories, Baxter International, and United States Surgical. Using standard appraisal techniques, Norman calculated a multiplier based on the ratio of price to earnings for the guideline companies. Under his methodology, such a multiplier applied to actual earnings yields market value. However, Norman then applied a 42.76% downward adjustment in value to compensate for the differences between Zinetics and the guideline companies.

¶ 26 The district court remarked that, "[a]s noted by Mr. Reilly, authoritative sources in the field of valuation view adjustments in excess of 50% with considerable suspicion. And for good reason. The necessity of a 50% adjustment suggests that the subjects of the comparison are more different than alike." Evidently concluding that the necessity for a 42.76% discount fell into the same category, the district court rejected Norman's valuation as seriously flawed. We uphold the district court's factual determination.

¶ 27 Reilly, the Minority's expert, identified guideline companies through a computer search screening for catheter man-

ufacturers similar to Zinetics in size and revenues that had brought a product to the production stage. Eleven companies met the criteria. None of these companies, however, had ever shown a net profit. Therefore, Reilly could not use the usual per share price over earnings ratio as the multiplier applied to earnings. Instead he resorted to market value of invested capital (MVIC) divided by revenues of each of the guideline companies (MVIC/revenue).[2] Medtronic assailed this method and demonstrated to the district court's satisfaction that the MVIC/revenue approach "yielded values which fluctuated inexplicably over time in a manner unrelated to the fundamental financial performance of the companies."

¶ 28 The Minority failed to rebut Medtronic's evidence, although provided an opportunity to do so by the district court. Moreover, the Minority has failed to marshal the evidence in favor of the district court's finding and show the evidence to be insufficient. This omission augments our deference to the factual findings of the court below. *See In re Estate of Bartell*, 776 P.2d at 886.

¶ 29 The Minority attacks the district court's finding that the values fluctuated "over time" as violating the section 16–10a–1301(4) requirement that stocks be valued immediately before the contested corporate action. This argument fails, however, because the district court did not consider the results from diverse dates to actually arrive at a value for Zinetics, but instead to test the consistency and reliability of the valuation method.

¶ 30 For example, Medtronic demonstrated that using the median MVIC/revenue ratio for the guideline companies for 1994 and applying it to Zinetics' revenues for that same year yields a market value for Zinetics of $6.1 million in 1994 (based on Zinetics' revenue of $1.5 million), while the same exercise yields a market value of nearly $36 million in 1995 when Zinetics revenue was

2. Interestingly, Reilly's own treatise on business valuation states that "[c]apitalization of revenues is applied most frequently to service businesses, such as advertising agencies, insurance agencies, mortuaries, professional practices, and some types of publishing operations. It generally tends not to work very well for manufacturing companies." Shannon P. Pratt & Robert F. Reilly et al., *Valuing a Business, The Analysis and Appraisal of Closely Held Companies*, 227 (3d ed.1996).

just over $2 million. Nothing in the record supports a 600% increase in market value based on a 33% increase in revenue. The apparent increase is an artifact resulting from the fluctuation of the MVIC/revenue per share of the guideline companies, which was approximately four in 1993–1994 and close to eighteen in 1994–1995. Furthermore, the MVIC/revenue value varies *inversely* with revenue.

¶ 31 In the face of such evidence, the district court stated that it "[did] not believe that Mr. Reilly's methodology produces values for Zinetics ... which would correspond to historical trends in the company's performance measured by revenue or net income." The court therefore concluded that "Mr. Reilly's market approach, like Mr. Norman's, should be substantially disregarded as unreliable." We agree.

### C. Investment Value

¶ 32 Having rejected both experts' market valuation models, the district court was left with only the investment value model upon which to rely. In *Oakridge Energy*, although neither party had submitted evidence of investment value, we noted that "courts have traditionally favored investment value ... as the most important of the three elements." 937 P.2d at 133 (citing *Dudley v. Mealey*, 147 F.2d 268, 270 (2d Cir.1945), *superseded on other grounds by statute as stated in In re B & W Enterprises, Inc.*, 713 F.2d 534 (9th Cir.1983); *Woodward*, 133 N.W.2d at 41). The *Libby* court found investment value to be "a central component of fair value." 406 A.2d at 66. We cited *Libby* in *Oakridge Energy* for the proposition that " '[t]he assets of a company are of value chiefly because of their earning capacity.' " *Oakridge Energy*, 937 P.2d at 133 (quoting *Libby*, 406 A.2d at 66).

¶ 33 The income approach to value applies the discounting and capitalization methods to cash flows and net earnings, making a total of four components. Discounted cash flow calculations involve projections for a determined number of yearly or other future period cash flows and a terminal value of the company's cash flow. These are discounted using a discount rate describing the required return on equity capital. Generally, higher risk dictates a higher required rate of return. Discounted earnings calculations apply the same method to earnings. In capitalized cash flow calculations, a capitalization rate that assumes certain growth and quantifies risk is applied to a past year's average or a current year's actual cash flow. The same method using earnings yields capitalized earnings.

¶ 34 Employing only the discounted cash flow method, Reilly arrived at a per share value of 13.4 cents. Norman arrived at a value of 1.97 cents per share using a weighted average value of discounted cash flow, capitalized cash flow, discounted earnings and capitalized earnings methods and applying a marketability discount of 31.9%. Norman explicitly valued Zinetics as part of Synectics.

¶ 35 The district court selected Norman's investment method valuation model, observing that investment model valuation as a subsidiary of Synectics is the most reliable approach for valuing Zinetics. It found the data, projections, and analyses in the various schedules of Norman's report to be consistent with these criteria. The district court disregarded Reilly's valuation, noting only that "Mr. Reilly limited his investment analysis to discounted cash flow." This unexplained rejection of Reilly's discounted cash flow valuation makes it difficult, if not impossible, for the Minority to marshal the evidence in favor of the court's decision and argue that it was insufficient. The Minority is left in the untenable position of having to guess at the basis of the court's decision—as indeed are we. The court has pointed to no specific flaw in Reilly's income valuation model, and none is obvious to us.

¶ 36 The court acknowledged "a measure of merit" in the Minority's criticisms that Norman had inexplicably reduced Zinetics projected earnings in 1998 from its actual 1997 earnings, considered only expected unit price increases for the catheters while disregarding inflation, and increased investor rate of return expectations using both a small cap company and a micro cap company adjustment. It identified no corresponding strengths in Norman's analysis. Therefore,

the district court recalculated the investment value and reported that "[w]hen the numbers proposed by [the Minority] for revenue, discount rate and capitalization rate are used to recalculat[e] Mr. Norman's investment valuations, the results do not exceed the $ .04528 per share offered by Medtronics for the respondent's common stock."

¶ 37 We note first that the district court was correct in recognizing the merit of Reilly's projections. Zinetics had enjoyed a history of robust growth and, furthermore, post merger events vindicated the Minority's optimistic income and cash flow projections. Former Zinetics President Davis testified that just before he left the company in April of 1999, gross sales had reached $600,000 per month. Reilly's initial revenue projections correspond closely to Davis' undisputed testimony that Zinetics' 1998–1999 revenues were between $4 million and $4.5 million. Norman's projections significantly underestimated reality, beginning at $2,846,854 for 1998.

¶ 38 The governing statute defines fair value as the value on the date of the merger, excluding changes in anticipation of the merger. Utah Code Ann. § 16–10a–1301(4) (1995). However, the statute contains no prohibition against employing hindsight to verify the value on the date of the merger, as long as the merger occasioned no change in that value. *Oakridge Energy* did not address this issue in the context before us here.

¶ 39 The trial transcript provides several salient observations from the district court regarding the distinction between a squeeze out merger and a typical dissenters' rights action. The district court remarked that in a dissenters' rights action, dissenters have at least the option to participate in the corporate action. However, a squeeze out merger amounts to a forced sale, with dissenters having no control over the decision to sell, the price, or the timing. We note that while it would be impermissible to consider post-merger increases above and beyond the pre-merger projections, post-merger information may be used to verify the projections. *See Gonsalves v. Straight Arrow Publishers, Inc.,* 701 A.2d 357, 362 (Del.1997) (supporting consideration of post-merger evidence to support projections).

¶ 40 If, as the district court held, Medtronic did not suppress the value of Zinetics in anticipation of the merger, then there is no presumption that short-term post-merger gains were the result of the merger. Therefore, we hold that in the instant case checking projections against subsequent actuality does not conflict with the requirements of section 16–10a–1301(4).

¶ 41 We also agree with the court's approval of Reilly's discount and capitalization rate. However, the court's failure to show its calculations leaves us with a number of questions. First, discounted cash flow was the only analysis that Reilly performed. This appears to be adequate, since in Norman's analysis that result was close to the average of the results from the four methods. However, the court's memorandum decision refers to inserting the Minority's projections for "revenue" rather than cash flow into Norman's model. Furthermore, Reilly's exhibit XI (Discounted Cash Flow Synthesis) sets forth three "scenarios" valuing Zinetics, respectively, at $11,263,000, $3,811,000, and $12,096,000. Each is based on a separate set of five yearly projections and a terminal value. The court did not indicate which of these sets, or what combination, it inserted into Norman's model. Finally, the court did not indicate whether it restricted its calculations to substituting Reilly's numbers in Norman's discounted cash flow model only, or whether it included other models.

¶ 42 These omissions are troubling because when the direct capitalization multiple and the projected cash flows set forth in Reilly's exhibit XI for years one through five and the terminal values for each of the three scenarios are inserted into Norman's Schedule J (Zinetics Medical Inc. Discounted Cash Flows as Part of Synectics) and the final results are averaged and then divided by the number of shares outstanding, the result is substantially more than 4.528 cents per share. This is also the case using the values from either scenario one or three. Only scenario two yields a value per share of less than the amount offered. The choice among

the three options, or the average of all three or any two, is a factual determination within the discretion of the district court. Yet the court has not explicitly made this determination.

¶ 43 Although the district court specifically approved Norman's investment valuation model, its later statement at least implies that if forced to choose between Norman's and Reilly's performance projections and discount/capitalization rates, it might choose Reilly's. The court interpreted the results of its calculations as eliminating the need for a choice. However, if Reilly's estimates operating in Norman's model yield a fair value of more than 4.528 cents per share, then a choice is necessary. Therefore, we approve the court's recognition of the factual validity of Reilly's estimates, as discussed above, and remand this case for recalculation. For each of Reilly's three "scenarios," or whatever combination of the three the court chooses, it should (1) insert the cash flow projections for years one through five and the terminal values from Reilly's exhibit XI into the calculations shown in Norman's Schedule J;[3] (2) calculate the "present value amount" for each year's cash flow, using Norman's multiples for "present value factor"; (3) calculate the terminal value for each, using Norman's 0.17 present value factor but replacing Norman's 16.45% capitalization rate with Reilly's direct capitalization multiple of 6.67; and (4) add the yearly and terminal present values to obtain the cumulative present value. If the court has found that the value is best represented by a combination of Reilly's scenarios, the court should then average the cumulative present values obtained for the combination of scenarios the court has chosen, to obtain the total value of Zinetics. Finally, the court should divide the cumulative present value derived from the court's choice of one or a combination of scenarios by 128,806,800, the number of shares outstanding, to obtain the fair value per share.

### D. Marketability Discount and Control Premium

■ ¶ 44 Given the strong probability that the per share fair value derived by the

method outlined above will be greater than 4.528 cents, we next address the issue of discounts. Norman's report states:

> All other things being equal, an interest in a business is worth more if it is readily marketable or, conversely, worth less if it is not. . . . There is not a ready market for [Zinetics'] stock. In our opinion, the fair value of Zinetics' stock would include a marketability discount. In the values that reflect the non-marketable nature of Zinetics' stock, we have applied a 31.93% discount.

Norman further stated that "[t]he market value of a security is impacted by the elements of control o[r] lack of control inherent in the block of stock being valued." Noting that "[i]n this valuation, the 18.56% block of stock is clearly a minority position," Norman confirmed that "[w]e have applied a 36.81% control premium when the value is identified to reflect a control position value."

¶ 45 Minority shares and shares considered non-marketable are subject in some contexts to discounts that place their value below a simple percentage of the total value of the corporation. Likewise, majority shares sometimes benefit from a "control premium." However, a majority of courts that have addressed the issue of minority discounts has held "that discounts at the shareholder level are inherently unfair to the minority shareholder who did not pick the timing of the transaction and is not in the position of a willing seller." *Hansen,* 957 P.2d at 41. Moreover, some courts have reasoned that "valuing the shares at less than their proportionate share of the corporation's fair value produces a transfer of wealth from the minority shareholder to the shareholders in control." *Id.* As the *Woodward* court observed, contrasting dissenters' valuation with tax valuation, "the statute is designed to protect the minority from the very considerations which resulted in a discounted value in the tax cases. By statute the minority is guaranteed the 'real' value of its stock." 133 N.W.2d at 44. The Eighth Circuit Court of Appeals observed in *Swope*

---

3. For example, in scenario 1, net cash flow is projected at $2,334,000 for year one and at $2,292,000 for year two, and the projected terminal value is $4,204,000.

that "[t]he American Law Institute explicitly confirms the interpretation of fair value as the proportionate share of the value of 100% of the equity, by entitling a dissenting shareholder to a 'proportionate interest in the corporation, without any discount for minority status or, absent extraordinary circumstances, lack of marketability.' " 243 F.3d at 492 (quoting American Law Institute, *Standards for Determining Fair Value, Principles of Corporate Governance: Analysis and Recommendations* (ALI) § 7.22(a) (1994)); *see also* Utah Code Ann. § 16–10a–301(4). The *Swope* court explained that " 'fair value' in minority stock appraisal cases is not equivalent to 'fair market value.' Dissenting shareholders, by nature, do not replicate the willing and ready buyers of the open market. Rather, they are unwilling sellers with no bargaining power." 243 F.3d at 492.

¶ 46 We agree and note that this is especially true of dissenting shareholders in a squeeze out merger. *See Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1145 (Del.1989); *Security State Bank v. Ziegeldorf*, 554 N.W.2d 884, 890 (Iowa 1996); *In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d 997, 1002–05 (Me.1989); *Rigel Corp. v. Cutchall*, 245 Neb. 118, 511 N.W.2d 519, 525–26 (1994). Therefore, the court should not employ discounts in its valuation of the Minority's shares of Zinetics.

### CONCLUSION

¶ 47 We hold that the district court was permitted to ignore asset value and that its careful consideration of the parties' evidence for market value fulfills the requirements of *Oakridge Energy*, although the court ultimately rejected both parties' market valuation methods as unreliable. We also hold that on the facts before us the accurately calculated income valuation yields an acceptable approximation of "fair value." We hold further that the court was correct in recognizing the merit of the Minority's performance projections and discount/capitalization rate. The court was also within its discretion to select Norman's income valuation model. However, the court made no explicit factual finding as to which of Reilly's sets of numbers, or what combination, best expresses the

value of Zinetics. Furthermore, the results that the court reported from its insertion of Reilly's numbers into Norman's model do not necessarily follow from the values and procedure that it expressed the intention to use. Since the calculations were not shown, we cannot verify them.

¶ 48 Therefore, we remand this case for recalculation, as specified above. *See supra* ¶ 43. We note that discounts are impermissible and hold that the result of the calculation described is the per share fair value of Zinetics. The Minority shareholders should receive 4.528 cents per share as offered by Medtronic, plus the excess, if any, of fair value over that amount, augmented by interest. It is unnecessary to appoint a "special master" in the instant case.

¶ 49 Affirmed in part, reversed in part, and remanded.

¶ 50 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice RUSSON, and Justice WILKINS concur in Justice HOWE'S opinion.