2001 UT App 226

**Roger K. EGGETT, Jr., an individual, Plaintiff and Appellee,**

v.

**WASATCH ENERGY CORPORATION, a Utah corporation, Defendant and Appellant.**

**No. 20000079–CA.**

Court of Appeals of Utah.

July 19, 2001.

Rehearing Denied Sept. 6, 2001.

---

Perrin R. Love, Clyde Snow Sessions & Swenson, Salt Lake City, for Appellee.

Merrill F. Nelson and Eric C. Olson, Kirton & McConkie, Salt Lake City, for Appellant.

Before Presiding Judge GREENWOOD, and Judges BILLINGS, and THORNE.

## OPINION

THORNE, Judge:

¶1 Defendant Wasatch Energy Corporation (Wasatch) appeals from a final judgment awarding plaintiff Roger K. Eggett, Jr. (Eggett) $147,559.96 and attorney fees. We affirm.

## BACKGROUND

¶2 In 1993, Eggett formed Wasatch to market and distribute natural gas, as well as to purchase, pool, and resell natural gas from producers too small to efficiently do so themselves. On April 13, 1995, Eggett entered into a Shareholder Agreement with

two Wasatch employees, Todd Cusick (Cusick) and Curtis Chisholm (Chisholm). The Shareholder Agreement identified Eggett as Wasatch's president. The Shareholder Agreement also set forth each shareholder's allotted shares of Wasatch stock.

¶ 3 The terms of the Shareholder Agreement, specifically, paragraph no. 2, provided that should a shareholder separate from the corporation, the remaining shareholders would have the option to purchase that shareholder's corporate stock. The remaining shareholders, as per the Shareholder Agreement, would either purchase the stock for "book value," if the separating shareholder voluntarily left the corporation, or for "par value" if the shareholder was terminated for cause. The Shareholder Agreement defined "book value" as the shareholder's net equity in the corporation, which would be determined by Wasatch's certified year-end financial statements. The Shareholder Agreement defined "par value" as the original price the shareholder paid for the stock.

¶ 4 In April 1995, Wasatch teamed with Magna Energy International (MEI) to expand Wasatch's business. At MEI's urging, two MEI representatives joined Wasatch's Board of Directors (the Board), which was formerly comprised of Eggett, Cusick, and Chisholm. Eggett, as Wasatch's president, retained personal control over operating expenditures, but a four-fifths majority of the Board was required to approve payroll, debt, and/or equity decisions.

¶ 5 In April 1997, Eggett tendered his resignation to the Board, effective July 14, 1997. Eggett's decision to resign was prompted by a series of disputes with Wasatch concerning the corporation's management structure, financial decisions, and Eggett's salary. As per the Shareholder Agreement, Eggett offered his corporate stock to the remaining shareholders "for the audited [b]ook [v]alue as of June 30, 1997," the date of Wasatch's fiscal year-end audit.

¶ 6 On May 1, 1997, after Eggett had tendered his resignation, Wasatch changed Eggett's employment status to a consultant. Wasatch also began conducting an audit of corporate accounts, including Eggett's expense account. The auditors, as evidenced in their report, concluded that Eggett had taken unauthorized compensation and reimbursements for personal expenses.

¶ 7 On May 16, 1997, Wasatch terminated Eggett for cause. Subsequently, as per the Shareholder Agreement, Wasatch tendered Eggett a check for the par value of his corporate stock, totaling $1,217. Eggett refused the tender, and Wasatch cancelled Eggett's corporate shares on its books.

¶ 8 On September 9, 1997, Eggett brought suit against Wasatch for (1) breach of his Employment Agreement with Wasatch, (2) breach of the Shareholder Agreement, and (3) breach of the covenant of good faith and fair dealing. In his complaint, Eggett sought compensation from Wasatch through his resignation date of July 14, 1997. Eggett also sought the book value for his shares of corporate stock, alleging that his for cause termination by Wasatch was a "sham." In response, Wasatch counterclaimed, alleging the following: (1) breach of fiduciary duties, (2) breach of the Employment Agreement, and (3) conversion of corporate assets.

¶ 9 At trial, Eggett testified that to determine the book value of his stock shares, "you take the equity of the company and you multiply it by my ownership interest which was 36.5%, so we have to determine the amount of ownership equity that was in the company." The parties agreed that determining stockholder equity would be accomplished by adding Wasatch's retained earnings to the stockholders' capital contribution.

¶ 10 Wasatch argued that its retained earnings, according to Wasatch's audited financial statements for June 30, 1997, totaled $57,703. When its retained earnings were added to the stockholders' capital contributions, the ownership equity totaled $75,452. Multiplying that figure by 36.5%, Wasatch argued that the book value of Eggett's shares was $27,540.

¶ 11 Eggett, however, argued that Wasatch's June 30, 1997 retained earnings should be adjusted to include the following: (1) $618,000 from a litigation "reserve fund" for a lawsuit involving United Utilities; (2) a $283,000 reserve for anticipated losses on a "swap contract," which did not occur; (3)

$296,252 for "suspense items," which included uncertain earnings or credits held in suspense on Wasatch's books; and (4) $45,533 for a disputed purchase contract with Grynberg Energy. Ultimately, Eggett withdrew his claim to the $618,000 litigation reserve, resulting in a claimed total retained earnings of $682,000. That figure coupled with the stockholders' capital contributions, brought the claimed book value of Eggett's shares of corporate stock to $255,419.

¶ 12 On November 10, 1999, the matter was submitted to a jury. Following deliberations, the jury awarded Eggett $11,888.35 for "additional compensation ... for the period from January 1, 1997, through May 1, 1997, and $135,671.61, as book value for his shares of stock in Wasatch."[1] Prior to discharging the jury and final entry of the judgment, the trial court had the following exchange with the jury foreperson concerning the book value of Eggett's shares of Wasatch stock:

> The Court: Question 5. On the date for evaluation of the shares you selected above, what was the book value of Wasatch ... as defined by the shareholders agreement? That, the answer is $135,671.61.
>
> ....
>
> The Court: Do I understand, Mr Robertson [jury foreperson], that the jury's decision, as I've read this question number, is this the value that the jury believes should be paid for the shares?
>
> Mr. Robertson: We believe that to be the book value.
>
> The Court: And so—
>
> Mr. Robertson: Paid for the shares.
>
> The Court: So, from the, I think the question was confusing and that's why I wanted to ask that question. The book value would be the value from which—yes, did you have a question?
>
> Mr. Stevens (Wasatch's counsel): It seems rather inappropriate to be coming up with questions for the jury at this time. The question is as it's stated and it's answered as it's answered.

> The Court: Well, I'm not going to allow that to stand if it is a mistake. So, if I can find that out now, I will find that out now.
>
> The Court: What you're saying by that, let me just be sure that I understand what we're talking about. Is this the value that you think [Wasatch] owes to Mr. Eggett to purchase his shares?
>
> Mr. Robertson: Yes
>
> The Court: All right. Now I'm going to ask that question of all of you as jurors if you concur in that determination. Let me go through.
>
> The Court: Do either of you [the parties' attorneys] desire that I poll the jury on any other questions?

¶ 13 Following the trial court's final question, Wasatch's counsel requested a sidebar wherein the following colloquy occurred:

> Mr. Stevens: Your Honor, the way this question is worded and the way this has been argued has been entirely talked about, at least from our point of view, (inaudible) book value of the company is. We know that ... Eggett has 36.5%. That's the number that should be applied here. To have them now—
>
> The Court: Okay, I'm not going to allow that and you can make a record of it but I'm not going to allow it. I don't believe it's consistent with their desire.
>
> Mr. Stevens: And it's certainly not consistent with what they've just said.
>
> The Court: That's exactly right and so— we'll make a record of it and that's just fine.

¶ 14 Upon completion of the sidebar, the trial judge continued with his questioning of the jury,

> The Court: Okay. I'm going to poll the jury on particularly question number 5. The question, here's the problem and I want to just explain it to the jury so that I get a clear understanding of what your decision is.
>
> We know from the facts of this case that ... Eggett owns 36.5%. If I interpret your answer to this question to be $135,000 for

1. Following a hearing on attorney fees, the trial court awarded Eggett nearly $60,000 in attorney fees in addition to the jury award.

book value. That would mean that he would be entitled to 36.5% of $135,000.00. If I understand it the way I have now asked you the question, he is entitled to $135,671.61 which is a number that you have come to by some calculation method for the purchase of his shares of stock. So, in other words, this figure, $135,000, is a representative smaller figure due to him which represents 36 percent of X which is the larger number. All right?

Now, I want to be sure that I understand that correctly and if any of you disagree with that, I want to know that.

The court then polled the jury, all of whom agreed with the trial court's interpretation of question no. 5. The court then concluded:

> The Court: All right. Okay, I'm going to enter, well, we have the record and we have indicated on the record what my understanding is. This question [number 5], I find, is ambiguous in its right and the way it was written and that the jury was [sic] spoken that the value is due to ... Eggett is for lost compensation, $11,888.00 and for his shares of stock, $135,671.61. That means that from this decision of the jury that those two numbers combined would ... $147,559.96.

¶ 15 Following the completion of the trial, based upon affidavit, the trial court awarded Eggett attorney fees. This appeal followed.

## ISSUES AND STANDARDS OF REVIEW

■ ¶ 16 Wasatch argues the trial court erred by admitting extrinsic evidence to supplement the Shareholder Agreement, concerning Wasatch's retained earnings for June 30, 1997. When reviewing a trial court's decision to admit evidence we seek to determine whether the trial court exceeded its permitted range of discretion. *See Olympus Hills Shopping Ctr., Ltd. v. Smith's Food & Drug Ctrs., Inc.,* 889 P.2d 445, 455 (Utah Ct.App.1994) (stating "the trial court did not abuse its discretion in admitting the above evidence").

■ ¶ 17 Next, Wasatch argues the trial court erred by clarifying special verdict question no. 5 and the jury's response to that

question. When reviewing a trial court's decision to clarify a jury verdict we seek to determine whether the trial court exceeded its permitted range of discretion. *See Jorgensen v. Gonzales,* 14 Utah 2d 330, 332–33, 383 P.2d 934, 935–36 (1963) (stating the trial court acted within "its prerogative" by "question[ing] the jury foreman about the possibility of a quotient or chance verdict"); *see also Romano v. U–Haul Int'l,* 233 F.3d 655, 671 (1st Cir.2000) (stating "[t]he standard of review for a determination of resubmission of special verdict questions is for abuse of discretion"); *Unit Drilling Co. v. Enron Oil & Gas Co.,* 108 F.3d 1186, 1192 (10th Cir.1997) (stating "it was an abuse of discretion for the trial court to refuse to ask the jury to clarify its verdict"); *Newcomer v. Weyerhaeuser Co.,* 26 Wash.App. 958, 614 P.2d 705, 708 (1980) (stating "[a] trial court is *empowered* to make such inquiry of the jury as is necessary to clear up a misunderstanding without first sending the entire case back for consideration" (emphasis added)).

¶ 18 Finally, Wasatch argues the trial court erred by awarding Eggett attorney fees because Eggett's counsel did not properly apportion out his nonrecoverable fees, and the trial court failed to support its ruling with supporting findings of fact. We do not reach the merits of this portion of Wasatch's claim because Wasatch has failed to satisfy the marshaling of evidence requirement. *See Moon v. Moon,* 1999 UT App 12, ¶ 24, 973 P.2d 431 (stating "[w]hen an appellant fails to meet the 'heavy burden' of marshaling the evidence, ... we 'assume[ ] the record supports the findings of the trial court'" (citation omitted)).

## ANALYSIS

### I. Admissibility of Adjustments to Wasatch's June 30, 1997 Retained Earnings

■ ¶ 19 Wasatch argues that the adjustments to the certified year-end audit determining Wasatch's retained earnings for June 30, 1997, are extrinsic evidence used by Eggett to vary the unambiguous terms of the Shareholder Agreement to establish the book

value of the corporate stock.[2] Accordingly, Wasatch argues that the trial court erred in admitting that evidence, because extrinsic evidence may not be used to supplement or alter the terms of an unambiguous contract.

¶ 20 Although we agree with Wasatch that extrinsic evidence is not generally admissible to vary the terms of an otherwise unambiguous contract, *see Willard Pease Oil & Gas Co. v. Pioneer Oil & Gas Co.,* 899 P.2d 766, 770 (Utah 1995), we find no reason why this otherwise relevant evidence [3] may not be offered in support of Eggett's claim for breach of the covenant of good faith and fair dealing. Indeed, Wasatch makes no argument why this evidence should not be admitted in support of Eggett's good faith claim.

¶ 21 In *Olympus Hills,* Olympus Hills brought suit against Smith's for breach of the covenant of good faith and fair dealing. The case arose because Smith's, an anchor tenant at the Olympus Hills center, relocated its supermarket and opened a "warehouse box store" in its place. *Olympus Hills,* 889 P.2d at 448. Smith's argued that its opening the "warehouse box store" satisfied the terms of its lease, which required Smith's to operate "any lawful retail selling business." *Id.*

¶ 22 At trial, Olympus Hills presented evidence that customer traffic at the center decreased when Smith's relocated the supermarket and opened the "warehouse box store." *Id.* at 454. Olympus Hills also presented evidence that the decrease in customer traffic adversely affected its tenants. *See id.*

¶ 23 Smith's, on the other hand, argued that the evidence was "irrelevant and highly prejudicial," *id.,* claiming that "the 'lease obligate[d] Smith's to run a business in that space and not to generate a lot of traffic for this center.'" *Id.* The trial court concluded that "although the testimony was not admissible as to a contractual duty by Smith's

under the lease to generate traffic, *it was relevant to determining whether Smith's had breached its covenant of good faith and fair dealing.*" *Id.* (emphasis added).

¶ 24 We determined that "the traffic evidence is relevant to whether Smith's breached its covenant of good faith and fair dealing[, because] … Smith's was obligated, in good faith, to choose a business to operate in the leased space." *Id.* Accordingly, we concluded that the trial court did not "abuse[ ] its discretion in admitting the evidence." *Id.* at 456.

¶ 25 In the present matter, Wasatch argues the trial court erred by "admitting Eggett's adjustments to company book value contrary to the parties' clear agreement that the audited financial statement conclusively established book value." Wasatch does not, however, explain why such evidence is not admissible to prove Eggett's claim for breach of the covenant of good faith and fair dealing. Indeed, the trial court alluded to possible bias by Wasatch in omitting the adjustments in its retained earnings for June 30, 1997:

> The Court: Okay. The Court has already indicated to you that it's the Court's view that the generally accepted accounting principles *may be affected by discretionary calls within the management or others in the corporation* and thus I believe that the plaintiff should have the opportunity to present adjustments to that statement. [Eggett is] not going to be specifically bound to the audited statement of June 30 or the unaudited statement of December, [19]96, the June 30, [19]97, for the reason that after his termination by the corporation financial decisions that *are discretionary* may be made and the making of those *discretionary decision[s]* can affect his value should the corporation elect those decisions obviously inconsistent with his benefit. And, thus, he should be allowed to challenge that and show that reasonable adjustments should be made to the finan-

---

2. The Shareholder Agreement states that " 'Book Value' shall mean the consolidated net shareholders' equity of the Corporation determined as of the end of each [fiscal year] as certified to by the firm of independent public accountants then regularly employed by the Corporation." (Alteration in original.)

3. *See* Utah R. Evid. 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable.").

cial statements as then audited because of the, let's say, *bias that had been incorporated by discretionary calls of the officers.*

(Emphasis added.)

¶ 26 We conclude that although the adjustments may be extrinsic evidence and not admissible to vary the terms of the Shareholder Agreement, they are "relevant to determining whether [Wasatch] had breached its covenant of good faith and fair dealing," *Olympus Hills,* 889 P.2d at 454, which is inherent in every contract, *see Malibu Inv. Co. v. Sparks,* 2000 UT 30,¶ 19, 996 P.2d 1043, by not including the adjustments in its June 30, 1997 retained earnings. Accordingly, we find the trial court did not exceed its permitted range of discretion in admitting the above evidence. *See Olympus Hills,* 889 P.2d at 455.

II. Clarification of Special Verdict Question No. 5 and the Jury's Response to that Question

¶ 27 Next, Wasatch argues the trial court "erred by altering the special verdict question to interpose its own view of the evidence after the jury had rendered its verdict." We disagree.

¶ 28 Utah Rule of Civil Procedure 47(r) states that "[i]f the verdict rendered is informal or insufficient, it may be corrected by the jury under the advice of the court, or the jury may be sent out again." *Id.* Further, in *Jorgensen,* our supreme court explained:

> [W]here it is apparent that there is some patent error in connection with the verdict, the [trial] court may of course call the matter to the[ ] [jury's] attention and direct them to redeliberate. In that regard it has been held, sensibly and properly, that where an amount is erroneously included the court may direct the jury to retire and correct it. The trial court appears to have acted not only within its prerogative but properly and discreetly in handling the situation.

*Id.* at 935–36.

¶ 29 We find additional case law from other jurisdictions regarding the clarification of jury verdicts persuasive. In *Romano v. U–Haul Int'l,* 233 F.3d 655 (1st Cir.2000), the jury returned a verdict in favor of the plaintiff, awarding her $0 in compensatory damages, $15,000 in nominal damages, and $625,000 in punitive damages. *See id.* at 661. The trial court "surmised that the jury probably confused nominal with compensatory damages and proposed resubmitting the two questions, after repeating the jury instructions, to the jury." *Id.* at 670–71.

¶ 30 Following the trial court's resubmission of the two questions and the jury instructions, the jury asked the trial court if only $1 could be awarded in nominal damages. *See id.* at 661 The jury then proceeded to award the plaintiff $15,000 compensatory damages and $0 in nominal damages. *See id.* The defendant appealed the resubmission of the interrogatories back to the jury. *See id.*

¶ 31 On appeal, the First Circuit explained that "[t]he standard of review for a determination of resubmission of special verdict questions is for abuse of discretion." *Id.* at 671. The court then explained that the trial court's "decision to resubmit the two questions and allow the jury an opportunity to correct its mistake" was not an abuse of discretion. *Id.* at 672. The court concluded:

> The [trial] court's interpretation of the jury's verdict made logical sense. It did not take the decision-making role away from the jury and gave the jury a second chance to render a proper verdict. The [trial] court was clear in its instruction of what appellee needed to prove in order to be entitled to compensatory damages.... The jury was not forced or coerced by the judge into reversing the nominal and compensatory damage awards.

*Id.* at 672.

¶ 32 In *Unit Drilling Co. v. Enron Oil & Gas Co.,* 108 F.3d 1186 (10th Cir.1997), the Tenth Circuit concluded that the trial court abused its discretion by refusing the plaintiff's request to ask the jury to clarify its damage awards. *See id.* at 1191. The court explained that "we approve[ ][of] the practice of asking the jury to clarify its meaning when the [trial] court is faced with an ambiguous verdict." *Id.* " '[P]ermitting questioning of jurors ... promotes the value of judicial economy; otherwise, in the event of an ambiguity the court would be left with no other

remedies than to order a new trial, even though a simple inquiry could clear up questions about how to read the damages verdict.'" *Id.* (quoting *Resolution Trust Corp. v. Stone,* 998 F.2d 1534, 1548 (10th Cir.1993)). Finally, the court reasoned that "ordering a new trial ... takes the case away from the jury that heard the case and that could decide it if given a chance to cure the ambiguity." *Id.* at 1192.

■ ¶ 33 In the present matter, both parties were permitted to argue (1) what amount constituted Wasatch's retained earnings for June 30, 1997, and (2) what the book value was for Eggett's Wasatch shares. Wasatch argued that its June 30, 1997 retained earnings were $57,703, and the stockholders' capital contributions totaled $75,452. As such, Wasatch argued that the book value for *all* Wasatch stock was $133,155, and Eggett's shares, 36.5%, were book valued at $27,540.

¶ 34 Eggett, on the other hand, argued that the adjustments should be included in the June 30, 1997 retained earnings, bringing Wasatch's retained earnings to $682,000. As such, Eggett argued that the total book value for Wasatch stock was $757,452, and Eggett's shares, 36.5%, were book valued at $255,419.

¶ 35 In light of these arguments, the trial court could have surmised "that there [wa]s some patent error in connection with the verdict," *Jorgensen,* 383 P.2d at 935, when the jury responded to special verdict question no. 5 and awarded Eggett $135,671.61.[4] If so, the trial court would have "acted ... within it[s] prerogative." *Id.; see also* Utah R. Civ. P. 47(r).

¶ 36 First, assuming question no. 5 requested that the jury determine the book value for *all* of Wasatch's stock, neither Wasatch's nor Eggett's figures results in the jury's figure of $135,671.61. Although Wasatch's figure is close, that further strengthens the possibility that there might have been an error in arriving at the figures. Second, assuming the question required the book value for *only* Eggett's shares, neither

Wasatch's nor Eggett's figures coincide with the jury's figure.

¶ 37 Third, and the most likely explanation, the trial judge, being intimately familiar with the figures argued during four days of trial, realized that the jury chose only to include a portion of the adjustments requested by Eggett in its calculations of Wasatch's June 30, 1997 retained earnings. Indeed, Wasatch's year-end audited financial statements, $75,452, plus the $296,252 "suspense account," combine to total $371,704, which if multiplied by 36.5%, totals $135,671.61, the *exact* figure the jury awarded.

¶ 38 To alleviate any possible confusion, the trial judge, having (1) reread the question to the jury foreperson, (2) determined that the question was confusing, and (3) informed Wasatch's counsel that he would not let the question stand if it was confusing, made the following inquiry of the jury:

> The Court: We know from the facts of this case that ... Eggett owns 36.5%. If I interpret your answer to this question to be $135,000 for book value. That would mean that he would be entitled to 36.5% of $135,000.00. If I understand it the way I have now asked you the question, he is entitled to $135,671.61 which is a number that you have come to by some calculation method for the purchase of his shares of stock. So, in other words, this figure, $135,000, is a representative smaller figure due to him which represents 36 percent of X which is the larger number. All right?
>
> Now, I want to be sure that I understand that correctly and if any of you disagree with that, I want to know that.

¶ 39 Based on the above inquiry and our review of the record, we conclude that the trial court's questions to the jury regarding its response to question no. 5 neither "forced" nor "coerced" the jury to alter its verdict. *Romano,* 233 F.3d at 672. Further, we conclude that the trial court's actions "did not take the decision-making role away from the jury," *id.,* but gave the jury the opportunity "to render a proper verdict." *Id.*

---

4. Special verdict question no. 5 states that "[o]n the date for evaluation of the shares that you selected above, what was the 'book value' of Wasatch ... as defined by the ... Shareholder Agreement?"

¶ 40 Finally, we agree with the rationale set forth in both *Romano* and *Unit Drilling* that permitting the trial court to question the jury regarding an ambiguous verdict promotes judicial economy and alleviates the need for a new trial when a simple inquiry may cure the ambiguity. Indeed, we commend the trial judge's thoroughness and attention to detail. Trial judges, when faced with similar situations, should have the latitude to ask questions in order to determine the true verdict of the jury. Accordingly, we conclude that the trial court properly exercised its discretion in clarifying special verdict question no. 5 and the jury's response to that question.

### III. Attorney Fees

¶ 41 Finally, Wasatch argues the trial court erred in awarding Eggett attorney fees because Eggett's counsel failed to apportion the recoverable and nonrecoverable fees. However, our review of the record reveals that Wasatch failed to marshal the evidence the trial court relied upon in awarding Eggett his attorney fees. Indeed, Wasatch neither provided this court with a transcript from the trial court's hearing on March 24, 2000, concerning attorney fees, nor any order from that hearing.

¶ 42 In *Moon v. Moon,* 1999 UT App 12, 973 P.2d 431, we explained,

"The marshaling process is not unlike becoming the devil's advocate. Counsel must extricate himself or herself from the client's shoes and fully assume the adversary's position. In order to properly discharge the duty of marshaling the evidence, the challenger must present, in fastidious order, every scrap of competent evidence introduced at trial which supports the very findings the appellant resists. After constructing this magnificent array of supporting evidence, the challenger must ferret out a fatal flaw in the evidence. The gravity of this flaw must be sufficient to convince the appellate court that the court's finding resting upon the evidence is clearly erroneous."

*Id.* at ¶ 24 (citation omitted).

¶ 43 Further, "[w]hen an appellant fails to meet the heavy burden of marshaling the evidence, ... we assume[ ] the record supports the findings of the trial court." *Id.* (internal quotations and citations omitted). Here, Wasatch failed to satisfy the marshaling requirement. Therefore, "we assume[ ] the record supports the findings of the trial court" and its decision to award Eggett his requested attorney fees. *Id.* (internal quotations and citation omitted).

### CONCLUSION

¶ 44 We conclude that the trial court did not exceed its permitted range of discretion in admitting evidence of adjustments to Wasatch's June 30, 1997 retained earnings. Further, we conclude that the trial court did not exceed its permitted range of discretion by clarifying special verdict question no. 5 and the jury's response to that question. Finally, we affirm the trial court's decision to award Eggett attorney fees.

¶ 45 The judgment of the trial court is therefore affirmed.

¶ 46 WE CONCUR: PAMELA T. GREENWOOD, Presiding Judge, JUDITH M. BILLINGS, Judge.