2007 UT App 351

Ivan RADMAN, Janet Radman, Donna Smylie, Peter Radman, Joanne Crook, Bronte Clark, Martin Radman, and Jordan Radman, Plaintiffs and Cross-appellees,

v.

FLANDERS CORPORATION, a North Carolina corporation, Defendant and Cross-appellant.

Flanders Corporation, a North Carolina corporation, et al., Counterclaim and Third-party Plaintiffs, and Appellee,

v.

Ivan Radman, Janet Radman, Donna Smylie, Peter Radman, Joanne Crook, Bronte Clark, Martin Radman, and Jordan Radman, Counterclaim Defendants and Appellants.

No. 20060479–CA.

Court of Appeals of Utah.

Oct. 25, 2007.

David M. Connors, Jennifer A. Brown, and Nicole C. Squires, Salt Lake City, for Appellants and Cross-appellees.

Clark Waddoups, Jonathan O. Hafen, and Michael D. Black, Salt Lake City, for Appellee and Cross-appellant.

Before BENCH, P.J., BILLINGS and DAVIS, JJ.

OPINION

DAVIS, Judge:

¶ 1 Plaintiffs and Counterclaim Defendants Ivan Radman, Janet Radman, Donna Smylie, Peter Radman, Joanne Crook, Bronte Clark, Martin Radman, and Jordan Radman (collectively, the Radmans) appeal various aspects of the trial court's decision on the counterclaim presented below. Defendant and Counterclaim Plaintiff Flanders Corporation (Flanders) appeals the court's decision regarding the Radmans' original claim. We affirm.

## BACKGROUND

¶ 2 In November 1997, the parties entered into an Agreement and Plan of Merger (the Agreement) whereby Flanders exchanged some of its restricted capital stock for all the stock of G.F.I., Inc. (GFI), a company owned by the Radmans that manufactured fiberglass and fiberglass air filters. Because the stock shares transferred by Flanders were restricted, the Radmans could not sell the shares for at least one year after the merger. To address the possibility that the stock trading prices might drop during this period, the Agreement contained a clause entitled "Market Protection" (the Market Protection Clause) that provided that the Radmans would receive additional compensation if such a drop were to occur.[1] When the Radmans were finally able to sell their shares, the trading price had fallen significantly below the $8.00 per share that it had been at the time of merger. Thus, the Radmans sought to enforce the Agreement's Market Protection Clause and obtain compensation for the full shortfall amount. Although Flanders did tender some additional shares of stock in an effort to comply with the Agreement, the value of these shares was not enough to fully compensate the Radmans for the shortfall amount, as the Radmans believed was required by the Agreement.

¶ 3 The Radmans brought this action against Flanders in May 2001, seeking damages for the uncompensated shortfall amount. Flanders counterclaimed, alleging, inter alia, that the Radmans had breached several warranties contained in the Agreement. The Radmans were successful on their claim regarding the uncompensated shortfall amount and were awarded damages in the amount of $547,904.50. Flanders, too, was successful on its breach-of-warranties counterclaim, and the trial court awarded damages of $1,162,528.00. The trial court then determined that both parties had prevailed and awarded them the reasonable at-torney fees incurred in connection with their prevailing claims. Thus, in the end, Flanders received a net award of $696,446.90. Both parties now appeal.

## ISSUES AND STANDARDS OF REVIEW

¶ 4 First, the Radmans contest the trial court's allowance of and reliance on extrinsic evidence of pre-Agreement conversation between the parties. "Whether evidence is admissible is a question of law, which we review for correctness, incorporating a 'clearly erroneous' standard of review for subsidiary factual determinations." *State v. Diaz,* 859 P.2d 19, 23 (Utah Ct.App.1993). Second, the Radmans assert that even if this evidence was appropriately admitted, the trial court's method of assessing breach-of-warranty damages was incorrect and unsupported by the evidence. "Whether the district court applied the correct rule for measuring damages is a question of law that we review for correctness. Whether the amount awarded by the district court was supported by the evidence is a determination of fact that may be reversed on appeal only if clearly erroneous." *Mahana v. Onyx Acceptance Corp.,* 2004 UT 59, ¶ 25, 96 P.3d 893 (citation omitted). Third, the Radmans argue that the trial court erred by offsetting Flanders's unliquidated award against the Radmans' liquidated award before calculating any prejudgment interest. This is a question of law, which we review for correctness. *See Saleh v. Farmers Ins. Exch.,* 2006 UT 20, ¶ 28, 133 P.3d 428 ("Generally, a decision to grant or deny prejudgment interest presents a question of law which we review for correctness." (internal quotation marks omitted)). Finally, the Radmans claim that we should reverse under the cumulative error doctrine, which requires us to apply the standard of review applicable to each underlying claim of error, each of which here is an abuse of discretion review.[2]

---

1. For the complete text of the Market Protection Clause, see *infra* Part II.A.

2. Respecting the cumulative error claim, all but one of the alleged errors regard the admissibility of evidence, for which the trial court is granted a large measure of discretion. *See State v. Powell,* 2007 UT 9, ¶ 13, 154 P.3d 788 ("A trial court's 'rulings on the admission of evidence ... generally entail a good deal of discretion.' " (omission in original) (quoting *State v. Pena,* 869 P.2d 932, 938 (Utah 1994))). The other alleged error involves the late addition of a counterclaimant, which we also review for abuse of discretion. *See Savage v. Utah Youth Vill.,* 2004 UT 102, ¶ 9,

¶ 5 Flanders primarily contests the trial court's interpretation of the Market Protection Clause, arguing that the trial court erred in concluding that the clause was ambiguous and in considering extrinsic evidence of the parties' intent to "completely rewrite[ ]" the clause. "We review for correctness the trial court's legal conclusion that the contract is ambiguous. If a contract is deemed ambiguous, and the trial court allows extrinsic evidence of intent, interpretation of the contract becomes a factual matter and our review is strictly limited." *Nielsen v. Gold's Gym*, 2003 UT 37, ¶ 6, 78 P.3d 600 (citation omitted). Flanders also argues that the trial court erred in determining that both parties prevailed below and in awarding attorney fees accordingly. The question of which party is the prevailing party is a question for the trial court, and we therefore review the trial court's determination on this matter for abuse of discretion. *See R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 25, 40 P.3d 1119. However, the court's interpretation of binding case law on this matter is a question of law, reviewed for correctness. *See Houghton v. Department of Health*, 2005 UT 63, ¶ 32, 125 P.3d 860.

## ANALYSIS

### I. The Radmans' Appeal

¶ 6 The Radmans assert that in relation to the counterclaim below, the trial court erred in several aspects, including using extrinsic evidence inappropriately, using an improper and unsupported method to determine damages, and refusing to award prejudgment interest. The Radmans also point to several other alleged errors in the context of a cumulative error argument. We address each argument in turn.

### A. Extrinsic Evidence

¶ 7 The Radmans argue that the trial court inappropriately considered extrinsic evidence in its determination that the Radmans breached the Agreement's warranties regarding the operating condition of cer-

tain equipment, specifically, electric melters. The Radmans assert that the Agreement's integration clause and the court's rulings that the warranties were unambiguous prohibited any sort of reliance on extrinsic evidence. The Radmans are correct in their argument that once a contract has been found to be unambiguous, the trial court may not rely on extrinsic evidence to determine the intent of the parties or to vary the terms of the agreement. *See View Condo. Owners Ass'n v. MSICO, LLC*, 2005 UT 91, ¶ 27, 127 P.3d 697 ("Well-settled law precludes us from considering extrinsic evidence to vary the terms of an unambiguous written agreement."); *Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991) ("If the contract is in writing and the language is not ambiguous, the intention of the parties must be determined from the words of the agreement."). Extrinsic evidence may, however, appropriately be considered for other purposes. *See, e.g., Eggett v. Wasatch Energy Corp.*, 2001 UT App 226, ¶ 26, 29 P.3d 668 (concluding that although certain extrinsic evidence was not admissible to vary the terms of a contract, the evidence was relevant in determining whether a party had breached the covenant of good faith and fair dealing), *aff'd*, 2004 UT 28, 94 P.3d 193. Here, it appears that any pre-Agreement statements relied on by the trial court were used not for altering the terms of the Agreement or for determining what the parties intended by the language of the warranties, but rather, the statements were appropriately used to assess whether the Radmans had actually breached those unambiguous warranties.

¶ 8 In the Agreement, the Radmans warranted that the assets being transferred were "in good operating condition and repair, ordinary wear and tear excepted." The trial court determined that this warranty was unambiguous and that it required "that the equipment performs the function expected of a similar piece of equipment in the industry to the standards of the industry, modified to take into account the effects of the equipment's age and prior wear." *See Utah State Med. Ass'n v. Utah State Employees Credit*

104 P.3d 1242 ("The district court's decision to allow amendment of the pleadings is reviewed for abuse of discretion resulting in prejudice to

the complaining party." (internal quotation marks omitted)).

*Union,* 655 P.2d 643, 645 (Utah 1982) (interpreting, in a similar way, a contract provision requiring "good condition," i.e., taking into account the equipment's age and previous use). The Radmans do not contest this interpretation, but argue that because the trial court determined that the warranty was unambiguous, the court was not allowed to rely on pre-Agreement statements to determine whether the equipment was in good operating condition.

¶ 9 We agree that in determining whether the equipment was in good operating condition, it would have been inappropriate for the trial court to have required the equipment to conform exactly to specific numbers mentioned in pre-Agreement statements. Such would, indeed, add terms to the Agreement. It was, however, appropriate for the trial court to use extrinsic evidence for other purposes, including to determine what good operating condition generally was for the electric melters, i.e., what was expected of similar pieces of equipment in the industry according to the industry standards. The Radmans assert that instead of looking to the normal operating condition of these particular melters, the trial court was required to "look[ ] to comparable used equipment of similar age when determining whether [the Radmans] had breached the warranty regarding the condition of the equipment." It is clear from the trial court's findings that it *did* look to other melters in the industry; however, the court's evaluation was not limited to such evidence because, as the Radmans acknowledge, the melters here were unique as they were electric melters and not the typical gas melters used by the remainder of the industry. Thus, some consideration of the generally expected operating function of these particular melters would be appropriate to determine what good operating condition was for electric melters, especially considering the parties' mutual understanding that the electric melters were superior to the gas melters used elsewhere in the industry.

¶ 10 We agree that in some findings the language of the trial court may be read as relying too heavily on the precise numbers mentioned in pre-Agreement statements and as requiring this specific level of performance for the equipment to be considered in good operating condition. But even assuming this were the intended meaning of those findings, we see no prejudice because the court made other findings—which rely on none of the pre-Agreement statements and which the Radmans do not contest—that alone would support the conclusion that the Radmans breached the warranty that the electric melters were in good operating condition. Specifically, relying on information regarding the function of other melters in the industry, the court determined that "[t]he industry standard for a melter is consistent operation 24 hours a day, seven days a week at least 90% of the time." The court also found that the electric melters here did not meet the industry standard, reasoning:

> As of the date of the merger and the date of [c]losing, the electric melters were not capable of running consistently for any length of time, were broken more than they were working,[3] and in particular could not run anywhere close to 24 hours per day, 7 days per week, as is typically required of that type of industrial equipment.

Although not based upon the Radmans' pre-Agreement statements, these findings alone support the conclusions that the melters were not in good operating condition and that the Radmans therefore breached this warranty.

¶ 11 The second warranty at issue provided that the Radmans "ha[d] not made any material misstatement of fact or omitted to state any material fact necessary or desirable to make complete, accurate and not misleading every representation and warranty set forth [in the Agreement]." Again, consideration of the pre-Agreement statements here was for an appropriate purpose—not to add

**3.** Specifically, the court found that problems with the melters included "fiber breakage, uneven temperature across the bushings, breakage of the bushings, bridging, transformers 'blowing up,' and problems with the 'weave' of the fiber-glass." It further found that these problems "prevented the electric melters from operating consistently and producing fiberglass of reasonable quality."

or vary the terms of the Agreement, but to determine if the unambiguous warranty already a part of the Agreement had been breached. Under this warranty, the pre-Agreement statements themselves would have constituted the breaches.[4] Thus, statements that the electric melters were functioning at high levels and were therefore in good operating condition,[5] when in reality the melters were not functioning anywhere near the level of good operating condition according to the industry standard, were breaches of this warranty. Moreover, we see no prejudice even had the court erred respecting this warranty because the court awarded no separate damages for any misrepresentations, but only awarded damages under the previously discussed warranty, i.e., damages resulting from the equipment not being in good operating condition.[6]

## B. Method of Valuation

¶ 12 The Radmans argue that even if they did breach the warranty regarding the condition of the equipment, the trial court inappropriately determined the value of the electric melters when calculating damages. Initially, the Radmans contest the trial court's reasoning that the appropriate way to determine damages was to determine the difference between the value of the melters as warranted—i.e., in good operating condition—and the actual value of the melters. The Radmans further assert that the trial court's determination of each of those values is unsupported by the evidence.

¶ 13 We see no error in the trial court's approach to determining damages. When determining damages for a contract

breach, "the aim in view is to put the injured party in as good a position as that party would have been in if performance had been rendered as promised" under the contract. 11 Joseph M. Perillo, *Corbin on Contracts* § 55.3, at 7 (rev. ed.2005); *see also Bevan v. J.H. Constr. Co.*, 669 P.2d 442, 444 (Utah 1983) ("[T]he general rule of damages ... arms the trial court with the discretion to place the litigants as nearly as possible in the position they would have enjoyed had the contract not been breached."). Thus, it was entirely appropriate for the trial court to determine the value of the assets in the promised condition and the actual value of the assets ultimately transferred, and to award the difference in those values as damages—all in an effort to place Flanders in the same position it would have been in had the Radmans not breached the Agreement's warranty.

¶ 14 The Radmans point to *Hogle v. Zinetics Medical, Inc.*, 2002 UT 121, 63 P.3d 80, to argue that the trial court's focus in calculating damages should not have been limited to asset value, but should have been directed at the fair value of GFI, which would include the consideration of market value and investment value in addition to asset value. Although we agree with Flanders that *Hogle* and other cases addressing valuing stock in the context of dissenters' rights are less than helpful under the facts before us where the breached warranty relates specifically to a transferred asset and not to the company's stock value, we also note that *Hogle* does not require a different result here. First, *Hogle* itself admits that " '[a]ll three components of fair value may not influence the result in

---

4. We recognize the potential inconsistency between an integration clause and a warranty—like the one here—that ensures against misrepresentations occurring prior to the contract formation. Nonetheless, the parties here plainly intended the application of such a warranty, and we therefore cannot simply ignore the warranty language based on the existence of an integration clause.

5. We disagree with the Radmans' assertion that the pre-Agreement statements regarding the high production capacity, low operating requirements, and lucrative payoff capability of the electric melters "have no bearing on whether the equipment was in 'good operating condition.' " Instead, we think that these statements were direct-

ly related to the issue; each statement was an assertion that the melters were indeed functioning at high levels, which would thus indicate that they were in good operating condition.

6. The Radmans mention in their brief a third warranty regarding financial statements. The trial court determined that the Radmans had breached this warranty, but the court also determined that Flanders had not proven any related damages. Because there was no prejudice to the Radmans and because Flanders does not contest the court's ruling regarding failure to prove damages, the Radmans do not discuss this warranty in any detail; and we likewise do not address it.

every valuation proceeding.'" *Id.* ¶ 18 (alteration in original) (quoting *Oakridge Energy, Inc. v. Clifton,* 937 P.2d 130, 135 (Utah 1997)). Second, the trial court here *did* initially consider more than asset value, finding both that "GFI had no inherent value as a going concern" and that "GFI had no 'good will' value." [7] As a result, the court determined that the entire value of GFI was solely attributable to its assets and that the sum of those assets would be equal to the entire amount that the Radmans were expecting to benefit from the merger—$1,500,016. Thus, the method that the court ultimately relied upon to calculate damages—the difference between the value of the assets as received and their value as warranted—would arguably directly correspond to the method which the Radmans assert was required—the difference between the value of GFI as received and its value as warranted.

■ ¶ 15 The Radmans additionally argue that even if the method for computing damages was correctly set forth by the trial court, there is not sufficient evidence to support the values the court used to do such computation. The Radmans spend a large part of their brief setting forth the facts that would support using other values, but our focus is only on whether there is sufficient evidence that, when viewed in the light most favorable to Flanders, would support the trial court's determination. *See Hal Taylor Assocs. v. Unionamerica, Inc.,* 657 P.2d 743, 747 (Utah 1982) ("It is well established that this Court will presume findings of fact to be correct and will not overturn them so long as they are supported by substantial evidence in the record. The Court must view the evidence and all inferences that might reasonably be made from the evidence in a light

most favorable to the judgment entered." (citation omitted)).

¶ 16 In arriving at the value of the melters as warranted, the trial court first found that the only assets with value—the sum of which accounted for the transaction price—were the accounts receivable, the inventory, and the electric melters. The court then subtracted from the transaction price the value of the first two assets, which values were uncontested by the parties, to arrive at the value the electric melters would have had as warranted. The Radmans argue that this method was flawed because the court failed to give any value to other GFI equipment. The evidence, however, supports the trial court's determination that the electric melters were the only equipment with value. There was evidence presented that (1) this other equipment was purchased by GFI in the early 1990s and was already about twenty-five years old at that point, (2) much of the equipment was in poor condition, (3) the equipment was "essentially valueless," (4) the equipment was written off by Flanders, and (5) some of the equipment was eventually scrapped because it could not be resold.

¶ 17 After determining the value of the electric melters as warranted, the trial court found that the melters had no actual value at the time of the merger. Again, there is sufficient evidence to support such a finding, such as (1) the melters "did not conform to industry standards," (2) Flanders spent much time and nearly $1.3 million in relation to problems with the melters, and (3) the melters were "'flawed technology'" and were without any value. Because there was sufficient evidence to support the findings of value arrived at by the trial court, and because

---

7. The Radmans argue that the findings regarding goodwill are "conclusory" because the fact that GFI was not operating at a profit and the fact that Flanders was more concerned in acquiring the electric melters than the ongoing business of GFI are not sufficient to arrive at this conclusion. But both of these factors were appropriate for the trial court to consider here, and the Radmans do not point to any authority indicating otherwise. Goodwill is defined as "the ability to earn income in excess of the income that would be expected from the business viewed as a mere collection of assets," *Black's Law Dictionary* 703 (7th ed.1999); thus, whether the business was

operating at any profit would surely be relevant. And the going-concern value of a business involves the future earning power of the business, *see id.* at 1549; therefore, evidence that Flanders was not concerned with the ongoing business of GFI and the additional finding that the Radmans were operating GFI primarily to develop the electric melters, speak to the future earning power GFI had as an active business. Moreover, the Radmans do not appropriately marshal *all* the record evidence supporting the findings regarding goodwill, as would be required in any attack upon the sufficiency of the evidence to support those findings. *See* Utah R.App. P. 24(a)(9).

its method of calculating damages was correct, we affirm the court's award of damages to Flanders for breach of warranty.

## C. Prejudgment Interest

¶ 18 The Radmans argue that they were entitled to an award of prejudgment interest before the court offset Flanders's award against their award. Both parties agree that Utah courts have not specifically addressed whether an unliquidated counterclaim should be offset before prejudgment interest is applied to a liquidated claim. The parties further agree that the prevailing law in other jurisdictions is that the offset is applied prior to calculating prejudgment interest—i.e., the interest is applied only to the balance of the awards—when the parties' claims are "related." *See Local Okla. Bank, N.A. v. United States*, 59 Fed.Cl. 713, 722 (2004) (applying the interest on balance rule to "claims aris[ing] out of related transactions"), *aff'd*, 452 F.3d 1371 (Fed.Cir.2006); *Fairway Builders, Inc. v. Malouf Towers Rental Co.*, 124 Ariz. 242, 603 P.2d 513, 537 (Ct.App. 1979) (stating that the interest on balance rule applies when "the unliquidated counterclaim offsets are attributable to the same contracts which are the basis of the primary liquidated claims"); *Hansen v. Covell*, 218 Cal. 622, 24 P.2d 772, 776 (1933) (applying the interest on balance rule where the counterclaim is "of a character such as to constitute payment to the [plaintiff]"); *York Plumbing & Heating Co. v. Groussman Inv. Co.*, 166 Colo. 382, 443 P.2d 986, 988 (1968) (stating that the interest on balance rule applies "in situations in which the two claims arise out of the same general transaction"); *Harmon Cable Commc'ns of Neb. Ltd. P'ship v. Scope Cable Television, Inc.*, 237 Neb. 871, 468 N.W.2d 350, 371 (1991) (agreeing that the interest on balance rule should be applied where "the claims arose from the same transaction"); *Mall Tool Co. v. Far W. Equip. Co.*, 45 Wash.2d 158, 273 P.2d 652, 663 (1954) (stating that the interest on bal-

ance rule is applicable "when the amount to which a defendant is entitled as a counterclaim or setoff is for defective workmanship or other defective performance by the plaintiff, of the contract on which his liquidated or determinable claim is based, of a character such that the award of damages as compensation is regarded as constituting either a reduction of the amount due the plaintiff or a payment to him"); *Hollon v. McComb*, 636 P.2d 513, 517 (Wyo.1981) (stating that the interest on balance rule should be applied "at least in those cases where the claims arise out of the same general transaction"); *see also Ralston Purina Co. v. Parsons Feed & Farm Supply, Inc.*, 416 F.2d 207, 211 (8th Cir.1969) (stating that the interest on balance rule does not apply when "the unliquidated counterclaim arises out of a collateral matter"); *Socony Mobil Oil Co. v. Klapal*, 205 F.Supp. 388, 393 (D.Neb.1962) (refusing to apply the interest on balance rule because "[t]he counterclaim d[id] not seek a reduction of the [amount owed] for any defects in the products supplied under that figure"); *Pocatello Auto Color v. Akzo Coatings*, No. 20349, 1994 WL 246701, 1994 Ida.App. LEXIS 76, at *34 (Idaho Ct.App. June 9, 1994) (refusing to apply the interest on balance rule because the counterclaim "was a separate claim for damages based on a matter collateral to [the original] claim"), aff'd in part and rev'd in part, 127 Idaho 41, 896 P.2d 949 (1995). We believe that the reasoning behind such an approach is appropriate to the facts of this case.

¶ 19 Prejudgment interest is awarded "to compensate for the full loss suffered by the plaintiff in losing the use of the money over time." *Kraatz v. Heritage Imps.*, 2003 UT App 201, ¶ 75, 71 P.3d 188. Where, as in this case, the two claims arose from the same transaction and the defendant's counterclaim arose before the plaintiff's claim arose, the plaintiff was never entitled to the amount equal to the counterclaim.[8] *See Hansen*, 24 P.2d at 776

---

**8.** The trial court determined that Flanders's damages for breach of warranty were incurred in November 1997, when the Agreement was signed, and that the Radmans' damages were incurred in April 1999, after the stock sale. In their reply brief, the Radmans argue that the

interest on balance rule should not apply because Flanders's counterclaim was not "demandable" at the time of merger. They argue that this is so because Flanders still used the equipment after the merger and because Flanders only asserted a claim regarding the warranties after the Rad-

(stating that the interest on balance rule applied "on the theory that the [plaintiff] is entitled to interest only on such amount of the use of which he has been deprived during the period of default"); *accord Mall Tool Co.,* 273 P.2d at 663. Thus, if the Radmans were owing an amount to Flanders under the contract, that amount must be subtracted from their later-accruing claim before prejudgment interest is applied. We agree with the trial court that "[b]ecause Flanders's[s] damages were incurred before any further payment was due to the Radmans and because the damages incurred by Flanders exceeded the additional payment due to the Radmans, the Radmans never were denied the use of money to which they were entitled." "It simply would not make good sense to charge [Flanders] interest on money [it] do[es] not owe." *Hollon,* 636 P.2d at 517. Thus, the trial court's failure to award prejudgment interest was not in error.

### D. Cumulative Error

¶ 20 The Radmans allege several other errors on the part of the trial court, including improperly allowing late-produced documents, summaries of documents, a late designation of an expert witness, substitution of a party, and testimony about settlement discussions. " 'Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence ... that a fair trial was had.' " *State v. Kohl,* 2000 UT 35, ¶ 25, 999 P.2d 7 (omission in original) (quoting *State v. Dunn,* 850 P.2d 1201, 1229 (Utah 1993)). However, if we determine that the claims are not errors on the part of the trial court or if we determine that any errors were "so minor as to result in no harm," we do not apply the

cumulative error doctrine. *See id.* Here the Radmans fail to show by their one-paragraph summaries of each of the alleged errors that these trial court actions even qualified as errors. Thus, the cumulative error doctrine is inapplicable in this case.[9]

### II. Flanders's Cross-appeal

¶ 21 Flanders contests two aspects of the trial court's ruling in favor of the Radmans on the original claim. Specifically, Flanders argues that the only plausible interpretation of the Agreement's Market Protection Clause is the one Flanders advanced below and that the court erred in determining that both parties had prevailed for purposes of awarding attorney fees.

### A. The Market Protection Clause

¶ 22 Flanders appeals the trial court's award to the Radmans under the Agreement's Market Protection Clause. Flanders argues that the trial court erred by determining that the clause was ambiguous and resorting to extrinsic evidence to decide that the Radmans' interpretation of the clause was correct.

¶ 23 The Market Protection Clause states:

> Pursuant to this Agreement, the G.F.I. Shareholders are receiving 187,502 shares of Flanders Capital Stock as set forth on Exhibit "A" attached hereto. Since the 187,502 shares of Flanders Capital Stock are restricted shares, each share has a discounted market value of $8.00 per share, for an aggregate market price of $1,500,016 (the "Market Price"). If at the time any of the G.F.I. Shareholders sell any of the 187,502 shares of Flanders Cap-

---

mans filed their claim. But the Radmans warranted the equipment as of the time of merger, and any breach of that warranty occurred at that time, giving rise to the Flanders's cause of action. *See Valley Colour, Inc. v. Beuchert Builders, Inc.,* 944 P.2d 361, 364 (Utah 1997) (" 'The true test in determining when a cause of action arises or accrues is to establish the time when the plaintiff could have first maintained the action to a successful conclusion.' " (quoting 51 Am.Jur.2d *Limitation of Actions* § 107 (1970))). And of course, when the claim was finally asserted has no bearing on when it actually arose.

9. Further, the only prejudice the Radmans point to resulting from these alleged errors is "an atmosphere in which the Radmans were placed at a significant disadvantage in preparing for and presenting their defense against Flanders'[s] counterclaim." But the Radmans do not explain how this atmosphere and the accompanying "unnecessary surprise and inconvenience" resulted in an unfair trial.

ital Stock at a price below $8.00 per share, and the average trading price for the preceding three business days of Flanders Capital Stock as listed on the NASDAQ Stock Exchange is below $8.00 per share, Flanders shall deliver additional restricted shares of Flanders Common Stock to such G.F.I. Shareholders in order to maintain the Market Price (the "Short Fall"), with such Short Fall shares valued at the Market Price.

The trial court ruled that the last phrase of the clause was ambiguous, as the meaning of the final term "the Market Price" was unclear. We agree that the phrase is confusing. But we also determine that when the clause is taken as a whole, there is only one plausible interpretation of the final usage of the phrase "the Market Price."

¶ 24 Flanders argues that the phrase "the Market Price" must in every instance refer to either "$8.00 per share" or "an aggregate market price of $1,500,016." However, we cannot consistently apply either one of these numbers in place of the phrase "the Market Price" without obtaining an absurd result. If we apply the $8.00 figure as argued by Flanders, the clause requires Flanders to issue extra stock "in order to maintain [$8.00 per share] (the 'Short Fall'), with such Short Fall Shares valued at [$8.00 per share]." This language is far from clear and if applied as the Flanders argue it should be—pretending the replacement shares had a value of $8.00 per share—would provide little "protection" for the Radmans and would not "maintain" in any way the value originally agreed upon. Indeed, under such a reading, the Radmans could realistically end up with a very small

fraction of the value agreed upon, notwithstanding the Market Protection Clause. Were we to strictly apply the other figure to the term "the Market Price," the result would likewise be absurd. The clause language would then require the extra stock issued "in order to maintain [an aggregate market price of $1,500,016] (the 'Short Fall'), with such Short Fall Shares valued at [an aggregate market price of $1,500,016]." Again, such an interpretation is nonsensical, valuing a single share at the total dollar amount intended to be represented by 187,502 shares.

¶ 25 Instead, as the trial court ultimately ruled, the only plausible interpretation of the final usage of the term "the Market Price" was that it meant something different than either of the numbers previously mentioned. We agree with the trial court that the very title of the clause "is evidence that the parties intended to insure that the Radmans[ ] would receive their full $1.5 million purchase price if the price of Flanders common stock dropped below $8.00 per share during the year following the merger." We also agree that the only way to "maintain" the price as intended by the parties and as stated by the Market Protection Clause was for the additionally issued shares to make up the total shortfall price, which means that the shares would have to be valued at their true and current price, i.e., the shares' market value at the time the Radmans sold the stock and the shortfall shares were issued.[10] Thus, applying this one plausible meaning did not "scrap[ ] the language used and agreed to by the parties,

10. Because the trial court determined that the Market Protection Clause was ambiguous, the court also looked to extrinsic evidence to determine what the parties intended at the time the Agreement was drafted. This extrinsic evidence gave further support to the interpretation ultimately arrived at by the trial court. Flanders argues that reliance on extrinsic evidence was inappropriate here because the Market Protection Clause was unambiguous as there were not "two or more plausible meanings" of the phrase at issue. See Alf v. State Farm Fire & Cas. Co., 850 P.2d 1272, 1274 (Utah 1993) (internal quotation marks omitted). We agree that there is only one plausible interpretation of the Market Protection Clause and that the clause was therefore unambiguous. But, even so, consideration of extrinsic evidence is proper here for the limited purpose of determining whether an ambiguity existed. See Ward v. Intermountain Farmers Ass'n, 907 P.2d 264, 268 (Utah 1995) ("Rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties ... so that the court can place itself in the same situation in which the parties found themselves at the time of contracting." (omission in original) (internal quotation marks omitted)). After using extrinsic evidence to consider the Agreement "in light of the surrounding circumstances," we see only one reasonable interpretation of the Market Protection Clause and we are able to determine the parties' intentions "solely from the language of the contract," as is discussed above. Id.

and rewr[ite] a provision with terms and calculations not found in the [Agreement]"; rather, it only replaced the one confusing usage of the term "the Market Value" with a previously-undefined, lowercase "the market value," i.e., the trade value of the shares at the time the shortfall shares were issued, which was the only plausible interpretation that would make sense when combined with the other language of the Market Protection Clause.

## B. Attorney Fees

 ¶ 26 Flanders contends that the trial court erred in the award of attorney fees below by awarding the parties the fees attributable to their successful claims. The question of which party is the prevailing party "depends, to a large measure, on the context of each case, and, therefore, it is appropriate to leave this determination to the sound discretion of the trial court." *R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 25, 40 P.3d 1119. This court has previously

> noted the difficulty in determining which party prevails in complicated cases involving multiple claims and parties, mentioned that in some circumstances both parties may be considered to have prevailed, and expressed the "need for a flexible and reasoned approach to deciding in particular cases who actually is the 'prevailing party.'"

*Id.* ¶ 24 (quoting *Mountain States Broad. Co. v. Neale*, 776 P.2d 643, 648 n. 7 (Utah Ct. App.1989), *clarified by* 783 P.2d 551, 556 (Utah Ct.App.1989) (mem. decision on petition for reh'g)). Under this flexible and reasoned approach, the trial court may appropriately consider, among other things "(1) contractual language, (2) the number of claims, counterclaims, cross-claims, etc., brought by the parties, (3) the importance of the claims relative to each other and their significance in the context of the lawsuit considered as a whole, and (4) the dollar amounts attached to and awarded in connection with the various claims." *Id.* ¶ 25.

 ¶ 27 It appears from the trial court's findings that the court, in appropriately applying the flexible and reasoned approach, took into account several of the above factors, in addition to other reasonable considerations—including that each claim was "factually distinct" and that trial on each claim was "procedurally distinct"—to arrive at its determination that both parties prevailed.[11] Because the trial court is in a better position than we are to make this determination, *see id.*, and because we see no abuse of the trial court's discretion in this matter, we affirm the award of attorney fees below.[12]

## CONCLUSION

¶ 28 First, we determine that it was proper for the trial court to rely on pre-Agreement statements to determine whether the Rad-

11. Flanders argues that the trial court erred by ignoring applicable case law, specifically, the case of *Cache County v. Beus*, 2005 UT App 503, 128 P.3d 63, wherein we stated that "[t]here can be only one prevailing party in any litigation," *id.* ¶ 14. That case, however, was the more typical and simplistic case in which only one party prevailed on each of the issues of the decision below. *See id.* ¶ 15. Further, *Beus* cites only two cases in support of this statement; one of which is *Mountain States Broadcasting Co. v. Neale*, 776 P.2d 643, 648 n. 7 (Utah Ct.App.1989), *clarified by* 783 P.2d 551, 556 (Utah Ct.App.1989) (mem. decision on petition for reh'g), and the other of which directly relies on *Mountain States Broadcasting*. The Utah Supreme Court has specifically addressed this cited language from *Mountain States Broadcasting* in *R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 25, 40 P.3d 1119. In *Cook*, the supreme court recognized that although there is generally only one prevailing party when contractual language similar to that here is em-

ployed, the flexible and reasoned approach "will permit a case-by-case evaluation by the trial court, and flexibility to handle circumstances where both, or neither, parties may be considered to have prevailed." *Id.; see also Brown v. Richards*, 840 P.2d 143, 154 n. 10 (Utah Ct.App. 1992) ("[B]oth parties are entitled to fees when both parties are successful in enforcing different provisions of a contract against the other." (citing *Trayner v. Cushing*, 688 P.2d 856, 858 (Utah 1984))).

12. The Radmans were the only party to request attorney fees on appeal. *See generally Brown*, 840 P.2d at 156 ("The general rule is that when a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal."). But as the Radmans were not successful on any of their claims on appeal, we do not award attorney fees on appeal.

mans had breached certain warranties, and that any use of these statements beyond this scope was harmless error. Second, the trial court applied the appropriate method for determining breach-of-warranty damages, and the court's findings underlying the damage award were supported by sufficient evidence. Third, the trial court did not err in its refusal to award prejudgment interest because the parties' claims were related and the Radmans would therefore have been allowed interest only on the balance of their award remaining after the offset of Flanders's award was applied, i.e., the amount of money of which they were truly deprived. Fourth, the cumulative error doctrine is inapplicable in this case because the Radmans have failed to show that the complained of actions were even errors. Fifth, as to Flanders's cross-appeal, the trial court looked to appropriate evidence and correctly determined that there was only one reasonable interpretation of the Market Protection Clause. Finally, the trial court reasonably considered several appropriate factors in determining that both parties prevailed, and thus, the court did not abuse its discretion in awarding attorney fees to both parties. Therefore, we affirm the decision of the trial court on all of the above issues.

¶ 29 WE CONCUR: RUSSELL W. BENCH, Presiding Judge, and JUDITH M. BILLINGS, Judge.